BENJAMIN *v.* WOODRING, Ex'r of the Estate of
William L. Benjamin, Sr.

[No. 220, September Term, 1972.]

*Decided April 25, 1973.*

594

The cause was argued before MURPHY, C. J., and BARNES, SINGLEY, SMITH and LEVINE, JJ.

*Melvin G. Bergman,* with whom were *Salvatore A. Daniello* and *Borelli, Daniello & Bergman* on the brief, for appellant.

*Orie Seltzer,* with whom was *Richard E. Painter* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

The testator in this case, William L. Benjamin, Sr., died on August 4, 1971, at the age of fifty, from an overdose of barbiturates. In due course, a petition for probate and a will dated July 12, 1971 were filed in the Orphans' Court for Prince George's County by appellee, Kenneth S. Woodring, Jr., as Personal Representative of the testator's estate. Shortly thereafter, the appellant, Betty L. Benjamin, the testator's wife, filed a petition and caveat, together with an earlier will executed by the testator on November 27, 1968; she sought to have the 1968 will admitted to probate, claiming that the 1971 will was null and void for want of testamentary capacity. The issue of testamentary capacity was certified to the Circuit Court for Prince George's County and a jury was impanelled. At trial, Judge William H. McCullough presiding, appellant undertook to establish that when the testator executed the 1971 will, he was suffering from an insane delusion with respect to her marital fidelity, and that the will, as a product of that delusion, was improperly admitted to probate. The court directed a verdict in appellee's favor at the end of the appellant's case, and this appeal followed.

The evidence at trial showed that appellant and the testator began living together in 1962, and had one son, William L. Benjamin, Jr. (known as David), born August 30, 1963. They were married on December 24, 1966. Each had children by previous marriages; no other children were born after the marriage. Appellant testified that the testator was "a very, very jealous man, and while he never really accused me of any particular

man at any time during our entire married life, if I had talked to another man he automatically assumed that they wanted to go to bed with me." She said that she had given her husband no reason to doubt her fidelity during their married life, and that he had never accused her of being unfaithful. She testified that during the last six months of their marriage, the testator had become "very reserved in communication with me," but that otherwise things were "pretty much the same." She said that they had never discussed divorce.

Ben Schwartz testified that the testator was his "dearest friend"; that in the month of July 1971, and on several prior occasions within six months of his death, the testator indicated to him that he was considering divorcing the appellant. Schwartz testified that in early July 1971 the testator told him that he was preparing a will "to make sure, I think, the children were protected, and he wanted to make sure PGP [Prince George's Properties, Inc.] was protected." Schwartz recalled "something . . . [the testator] did say about infidelity to me at one time there." He said that he tried to make the testator "understand at the time that I felt that he was more or less overreacting"; that "I didn't feel that this was so at all." When asked exactly what the testator said with respect to the appellant's infidelity, Schwartz replied: "Honestly before God, I cannot remember what he actually did say."

Appellant also called Dr. Charles Springate, an assistant State medical examiner who had examined the testator's remains. The court advised the jury that according to the death certificate prepared by Dr. Springate "the immediate cause of death was an overdose of barbiturates." Upon appellee's objection, the court refused to admit into evidence the death certificate which expressed Dr. Springate's opinion that death resulted from suicide.

Three documents pertinent to the issue of insane delusion were admitted into evidence: the 1968 and 1971

wills, and a note written in the testator's handwriting to the appellant. By the terms of the 1968 will, the testator's entire estate was given to appellant with the further provision that if she predeceased the testator, the estate would go to their five named children in trust during the minority of any of them, "absolutely and in fee simple" when the last shall have attained his majority. By the terms of his 1971 will, the testator limited appellant to her statutory share of his estate;[1] he made specific bequests to three children,[2] and two non-relatives;[3] he directed a continuation of payments in the amount of present alimony to his first wife; and he gave the residue of his estate to "David" Benjamin in trust during his minority. The 1971 will also directed the Per-

1. The provision concerning appellant read:
"THIRD: I give, devise and bequeath unto my beloved wife, Betty Louise Benjamin, provided she survives me for sixty (60) days, her statutory interest then existing under the laws of Maryland at the time of my demise regulating the disposition of personal estates or intestates, and in respective amounts provided thereby. I further hereby direct that my beloved wife, Betty Louise Benjamin, shall not receive more than the minimum provided by law, which at the making of this Last Will and Testament is one-third (⅓) of my estate.
"Provided, however, if my beloved wife shall die simultaneously with me or under such circumstances that it is impossible, or there is no sufficient proof, to determine who predeceased the other, or in the event my said wife dies within sixty (60) days after my demise, my said wife, Betty Louise Benjamin, shall NOT be deemed to have survived me and the provisions of this my Last Will and Testament shall be construed upon that presumption, notwithstanding the provisions of any law establishing a different presumption of order of death.
"Provided further, however, that, notwithstanding anything contained in this Will to the contrary, if my said wife shall renounce the provisions of the Will, then my estate shall be administered and disposed of, and this Will shall be construed in the same manner as if she had predeceased me."
2. The two children mentioned in the 1968 will but excluded from the 1971 will are apparently appellant's children by her previous marriage. No claim is made in the caveat as to anyone other than appellant, and we note this change merely to clarify the testamentary scheme of the respective wills.
3. $5000 to "my good friend and trusted employee of Prince George's Properties, Inc., Sandra Midgeley"; and "my forty-two (42') foot fishing boat, known as the 'Rock-A-Bye,' free and clear from any and all incumbrances and indebtedness" to Manford Phillips (not identified in the record before us).

**598**

sonal Representative, upon David's majority, to sell all shares of Prince George's Properties, Inc. (the testator's main business interest) with first right of refusal granted to specified "faithful and trusted employees," the proceeds to be divided equally among the three children. The total amount of the estate is not indicated in the record before us.

The testator's handwritten note admitted into evidence was found by appellant in a briefcase shortly after his death; dated June 28, 1971—approximately two weeks before the will in question was executed, and approximately five weeks before the testator's death—the testator's note to the appellant was as follows:

"Betty Benjamin

I guess there is so much to say I find it difficult in starting. You have done a lot for me over the years, and you have caused many heart ach, hour of mental anguise, and a reason to want to stop the world & get off. from the early days of our relationship you have not be able to over come the party girl thrills, I dont blame you getting all you could get out me, you treated me like worse than a dog you thrill in going into bars, you thrill in men making a fuss over you. I've prayed that you had changed after you last fling at Fred's cottage several years ago.

Ive been a fool you know it and you have taken full advantage of it. the thought of going on in life knowing that you will only become meaner, and of course you will become bold and as you succeed in business, you will push to do the things that you want & like to do, with boys gone and only David I'm sure you will be free to go.

You've played a great game with me, and I just cant go any further with it,

I've given up everything I worked so hard for. all I have left is a memory of some of the nicer

things that happened before & after meeting you.

I'm fully aware now of my great mistake, as I think everyone knew the outcome but me, and of course I was sure that if given a chance you would change to be the person I wanted you to be, you & Fred can have your laughs & your kicks, I'm sure you wont find things as easy as they were planned because after finding approving the boys bringing beer etc in the home & then taking Billy into the bars with you I made some changes, which Im sure will stand up any court you appeal to. You know after the trip to Greensboro the one that you stayed out all nite with someone. I almost walked out on you & I should have, but you always hung over my head, the story about carrying my baby and if you really want to know I would had left you many years ago, but I loved you and I didn't want to go further to worse at this point Im sure you are laughing go ahead

I've taken care of David I hope only you know who the father of this boy is, or maybe it might be that you dont know I didn't leave you anything and I hope the shop get involved in the estate, you shouldnt worry about this you have always used your good look & your bed ability to get by and Im sure you not to old to still be successful at party girl roll, you can burn this after reading it, but Im making several copies to be open after my death. Youve worked hard at putting down & running my life and even to the point of hoping something would happen to me, okay it has happen now how do you feel,? Im glad life is over for me, please dont attend my funeral or the viewing of the body—in fact I dont have any family, I gave the one I had up for you & yours. your mother & dad have been wonderful & a real pleasure in my life. I want

him to keep the car there should be insurance to pay for it.

I hope that will find someone that loves you as much as *I did*, and I hope that you can & will appreciate it this time because love can turn into hate,"

Evidence proffered by appellant but not admitted by the trial court on the ground of remoteness, included:

(1) the testator's United States Navy medical records from 1950 and 1951, showing delusional episodes during a nine-month hospitalization for psychiatric observation and a diagnosis of dementia praecox, paranoid type;

(2) two records from the Washington Hospital Center signed by Dr. Jonathan Williams (1962-1963), indicating "Opinion—Schizo Depression with possible drug intoxication" and "Opinion—Anxiety Depressive Reaction possible schizophrenia";

(3) testimony of Dr. Jonathan Williams relative to the reports in (2) above;

(4) testimony of Dr. James Burns relative to the testator's psychiatric history taken in the early 1950's.

# I

Appellant contends that the evidence admitted by the trial court was legally sufficient "to make out a *prima facie* case that the Testator was suffering from an insane delusion concerning his wife's fidelity when he executed the Will of July 12, 1971, and that the will was a product of those delusions." She maintains that the trial court took a "very myopic view" of the evidence; that it confused what it thought would be the ultimate success of appellant's proof before the jury, with the quantum of proof necessary to survive the motion for a directed verdict made at the conclusion of appellant's case.

It is settled law in this State ". . . that when a testamentary disposition is the direct consequence and off-spring of the testator's delusion, which was calculated to pervert his judgment and control his will in respect to the disposition of his estate, the court should hold that he did not possess testamentary capacity, although he may have been rational and sane on other subjects." *Doyle v. Rody*, 180 Md. 471, 477-478, 25 A. 2d 457, 460 (1942). To set a will aside on the ground of a delusion, it is necessary for the caveator to show (1) that the delusion was an insane delusion, and (2) that the will was the consequence or the product of the delusion. *Sellers v. Qualls*, 206 Md. 58, 110 A. 2d 73 (1954); *Doyle v. Rody, supra; Johnson v. Johnson*, 105 Md. 81, 65 A. 918 (1907); *Jones v. Collins*, 94 Md. 403, 51 A. 398 (1902). An insane delusion, in the legal sense, is "a belief in things impossible, or a belief in things possible, but so improbable under the surrounding circumstances, that no man of sound mind could give them credence," *Johnson v. Johnson, supra*, 105 Md. at 85-86, 65 A. at 919; otherwise defined, an insane delusion is "a false belief for which there is no reasonable foundation, and which would be incredible under similar circumstances to the same person if he were of sound mind, and concerning which his mind is not open to permanent correction through argument or evidence," *Doyle v. Rody, supra*, 180 Md. at 479, 25 A. 2d at 461.[4] *See also Townshend v. Townshend*, 7 Gill 10 (1848). The testator may be outwardly competent in every other area and yet have an insane delusion or "monomania." *Brown v. Ward*, 53 Md. 376, 394 (1880). The law of insane delusion, as expounded in England by Chief Justice Cockburn in *Banks v. Goodfellow*, 5 L.R.Q.B. 549, 560, 565, was quoted by us with approval in *Doyle*, 180 Md. at 478-79, 25 A. 2d at 461, *viz.*

---

4. Both Johnson and Doyle involved an insane delusion concerning the character of a member of testator's family: In Johnson the testator believed his two children to be illegitimate; in Doyle, the testator believed that his niece had stolen from him.

" 'The pathology of mental disease and the experience of insanity in its various forms teach us that while, on the one hand, all the faculties, moral and intellectual, may be involved in one common ruin, as in the case of the raving maniac, in other instances one or more only of these faculties or functions may be disordered, while the rest are left unimpaired and undisturbed; that while the mind may be overpowered by delusions which utterly demoralize it and unfit it for the perception of the true nature of surrounding things, or for the discharge of the common obligations of life, there often are, on the other hand, delusions, which, though the offspring of mental disease and so far constituting insanity, yet leave the individual in all other respects rational, and capable of transacting the ordinary affairs and fulfilling the duties and obligations incidental to the various relations of life. No doubt when delusions exist which have no foundation in reality, and spring only from a diseased and morbid condition of the mind, to that extent the mind must necessarily be taken to be unsound . . . . It is essential to the exercise of such power . . . that no disorder of the mind shall poison his affections, pervert his sense of right, or prevent the exercise of his natural faculties—that no insane delusion shall influence his will in disposing of his property and bring about a disposal of it which, if the mind had been sound, would not have been made. . . . If the human instincts and affections, or the moral sense, become perverted by mental disease; if insane suspicion, or aversion, take the place of natural affection; if reason and judgment are lost, and the mind becomes a prey to insane delusions, calculated to interfere with and destroy its functions, and to lead to a testa-

mentary disposition, due only to their baneful influence—in such a case it is obvious that the condition of the testamentary power fails, and that a will made under such circumstances ought not to stand.' "

The law in Maryland on insane delusions is in accord with the law in other jurisdictions. *See* 1 Page, *Law of Wills* 631, §§ 12.29, *et seq.* (Bowe-Parker Revision 1965) ; Atkinson, *Handbook of the Law of Wills,* 242-48 (2d Ed. 1953) ; 94 C.J.S. *Wills* § 18 (1956).

In determining whether appellant produced evidence legally sufficient to survive the motion for a directed verdict, we must resolve all conflicts in the evidence in favor of the caveatrix, and assume the truth of the evidence produced thereby, as well as all reasonable inferences in her favor that may be drawn from the evidence. *Ingalls v. Trustees of Mt. Oak Methodist Church Cemetery,* 244 Md. 243, 247, 223 A. 2d 778, 779 (1966). We thus are not concerned with the weight of the evidence produced by the caveatrix (which appellant concedes, *arguendo,* is slight and which she characterizes in a more affirmative vein as "sophisticated" and "subtle"), but rather its legal sufficiency to carry the case to the jury under the test above articulated.

The testator's handwritten note contains statements from which the jury could reasonably infer that he believed his wife was unfaithful to him, both before and after their marriage, and that he had recently given up hope that she would change her ways. The testimony of Schwartz tended to corroborate the existence of this suspicion in the testator's mind. Appellant testified that she had never given the testator any reason to doubt her fidelity; her testimony was buttressed by that of Schwartz, the testator's "dearest friend," when he said: "I tried to make him [testator] understand . . . that I felt that he was more or less over-reacting. I didn't feel that this was so at all." From this evidence we think a jury could have found that the testator, during a period

within weeks of the execution of the 1971 will, was suffering from an insane delusion, as defined by cases such as *Doyle*, *i.e.*, "a false belief for which there is no reasonable foundation, and which would be incredible under similar circumstances to the same person if he were of sound mind, and concerning which his mind is not open to permanent correction through argument or evidence." Interwoven among the implications of infidelity and misconduct contained in the testator's note to the appellant, are references to intended changes in his will ("I made some changes, which I'm sure will stand up any court you appeal to"; "I didn't leave you anything and I hope the shop get involved in the estate"), which, when considered in light of the provision actually made in the will limiting her to the bare minimum required by law, could lead a jury reasonably to conclude that the diminishment in appellant's share of the testator's estate, comparing the 1968 and 1971 wills, was the result of an insane delusion entertained by him concerning his wife's fidelity.

We think, therefore, that legally sufficient evidence was adduced by appellant to require submission of the case to the jury on the question of testamentary capacity at the time the testator executed his 1971 will. In so concluding, we neither give nor imply any view as to the proper resolution of the substantive issue; we hold only that on the state of the record before us, the trial court was in error in taking the case from the jury and directing a verdict against the appellant.

## II

As heretofore indicated the trial court advised the jury of the parties' stipulation that the death certificate prepared by Dr. Springate, the assistant medical examiner, stated that the immediate cause of the testator's death was an "overdose of barbiturates." The court refused, however, to admit the death certificate itself into evidence on the ground that it contained Dr. Springate's

opinion that the testator's death resulted from suicide. Appellant challenges the court's ruling, contending that the death certificate was admissible in its entirety. She claims that the issue of suicide is relevant in the case; that even though not constituting proof per se of the testator's suffering from insane delusions, it can be, together with the other facts in evidence, a fact bearing upon testamentary capacity at the time the will was executed, consistent with our holding in *McElwee v. Ferguson*, 43 Md. 479 (1876). Since on retrial of the case the issue is likely to arise again, we shall express our views for the guidance of the trial court.

The record shows that appellant proffered a certified true copy of the "Medical Examiner's Certificate of Death." Over the signature of Dr. Springate, it contained the name of the testator, factual information as to his sex, race, date of birth, date pronounced dead, address, marital status, and on line 17 "Informant" indicated *"Betty L. Benjamin."* The following responses (italicized) were contained in the section marked "MEDICAL CERTIFICATION:" line 18, "Death was caused by: Immediate cause" *"Overdose of barbiturate"*; line 21c "How injury occurred," *"Took overdose of barbiturate."* Line 22a of the same "MEDICAL CERTIFICATION" section read:

> "I certify that I took charge of the remains described above, held on Autopsy ☐, *Inspection* ☒, Inquiry ☐, and in my opinion death resulted from: Natural causes ☐, Accident ☐, *Suicide* ☒, Homicide ☐, Undetermined manner ☐."

Dr. Springate testified that his inspection of the remains of the testator consisted of an external examination of the body, and three fluid tests which showed blood barbiturates at 3.27 milligrams per cent (short acting barbiturate type) ; blood alcohol negative; carbon

monoxide level normal. He said that the 3.27 milligrams per cent

> ". . . is extremely high because it is considerably higher than the blood barbiturate level, that is, short acting barbiturate level, that we ordinarily find in cases of people who die as a result of an overdose of barbiturate."

The court ruled that that part of the death certificate expressing Dr. Springate's opinion that death resulted from suicide was inadmissible in evidence under Maryland Code (1957, 1971 Repl. Vol.) Article 43, § 26, which provides in pertinent part:

> "Certificates of birth, death and fetal death filed within one year after the event, and certified copies of such certificates shall be prima facie evidence of the *facts therein stated*. . . ." (Emphasis added.) [5]

The court explained its ruling:

> "The Court feels that the statute does not say that the certificate shall be prima facie evidence

---

5. No question was raised with respect to the applicability of Maryland Code (1957, 1973 Repl. Vol.) Article 22, § 8; that section provides:

"It shall be the duty of the chief medical examiner, and the deputy medical examiners, to keep full and complete records in their respective offices, properly indexed, giving the name, if known, of every such person, the place where the body was found, date and cause of death, and all other available information relating thereto. The original report of the chief medical examiner, assistant medical examiners, or deputy medical examiners, and the detailed findings of the autopsy, if any, shall be attached to the record of each case. . . . The records of the office of the chief medical examiner, and of the several deputy medical examiners, made by themselves or by anyone under their direction or supervision, or transcripts thereof certified by such medical examiner, shall be received as competent evidence in any court in this State of the *matters and facts therein contained.* . . . The records which shall be admissible as evidence under this section shall be records of the results of views and examinations of or autopsies upon the bodies of deceased persons by such medical examiner, or by anyone under his direct supervision or control, and shall not include statements made by witnesses or other persons." (Emphasis added.)

of all the matters required to be incorporated in the statute. The statute, in making the certificate prima facie evidence, confines itself to 'facts' and makes no reference to indications, inferences, or conclusions drawn by the certificate maker."

The court had earlier indicated that, on the basis of three blood tests and an external examination, Dr. Springate lacked a foundation for his opinion that the overdose was deliberate rather than accidental.

There are no Maryland cases bearing on the question whether, under Article 43, § 26 or Article 22, § 8, recitals in a death certificate constitute admissible proof that death resulted from suicide; under similar statutes, however, the question has been frequently involved in litigation in other jurisdictions (in suits to recover insurance proceeds, and in workmen's compensation, wrongful death, and homicide cases). See cases collected in: Annot., ("Official Death Certificate As Evidence Of Cause of Death in Civil or Criminal Action") 21 A.L.R.3d 418 (1968); Annot., ("Insurance: coroner's verdict or report as evidence on issue of suicide") 28 A.L.R.2d 352 (1953); 5 Wigmore, *Evidence,* 588-90, § 1646 (3d Ed. 1940); 30 Am. Jur. 2d *Evidence* § 1009 (1967).

Prior to the enactment of statutes such as Article 22, § 8 and Article 43, § 26, Maryland courts refused to admit a death certificate in evidence, finding that it was subject to a hearsay objection among others. *Standard Gas Equipment Corp. v. Baldwin,* 152 Md. 321, 325-26, 136 A. 644, 646 (1927); *Supreme Council of the Royal Arcanum v. Brashears,* 89 Md. 624, 629, 43 A. 866, 868 (1899); *Metropolitan Life Insurance Co. of New York v. Anderson,* 79 Md. 375, 378-79, 29 A. 606, 607 (1894). Subsequent cases insisted on strict adherence to the statutory requirements, *Mayor and City Council of Baltimore v. State ex rel. Blueford,* 173 Md. 267, 270, 195 A. 571, 573 (1937), *Rasnick v. State,* 7 Md. App. 564,

568-69, 256 A. 2d 543, 545-46 (1969), but held that when such requirements were met, pertinent parts of the certificate were admissible. *State ex rel. Schiller v. Hecht Co.*, 165 Md. 415, 424, 169 A. 311, 314 (1933). *Cf. Carroll v. State*, 11 Md. App. 412, 274 A. 2d 677 (1971). None of these cases, however, directly involved the question whether the entry on the death certificate of an opinion as to the manner of death (accident, homicide, suicide), as opposed to demonstrable medical facts as to the cause of death (overdose of barbiturate), constitutes evidence admissible under the cited Maryland statutes.

On this issue, the cases in other jurisdictions are divided, some courts holding that opinions or conclusions contained in a properly certified death certificate are admissible as "facts therein stated," *see, e.g., California State Life Ins. Co. v. Fuqua*, 40 Ariz. 148, 10 P. 2d 958 (1932), other courts strictly limiting the statutory language to "facts," refusing to admit portions of the certificate which plainly represent opinions or conclusions of the maker, *see, e.g., Carson v. Metropolitan Life Insurance Co.*, 156 Ohio St. 104, 112-14, 100 N.E.2d 197, 202-03 (1951). We think the latter position is the better-reasoned in light of the statutory duties imposed upon medical examiners in this State under Article 22 of the Code. Under the Maryland statutes, post-mortem examiners are expressly denied the power formerly held by coroners—whom they replaced in 1939—to summon a jury of inquisition to inquire into the circumstances surrounding death; instead, the investigative duties of medical examiners are limited to "essential facts concerning the *medical* causes of death." Article 22, §§ 6, 9. It was the evident intention of the Legislature when enacting Article 22 to separate the former duties of coroners into two separate spheres, delegated to persons possessing the requisite expertise in each sphere—the medical duties to be performed by the medical examiner, and the non-medical investigatory function committed to State's Attorneys. Article 22, § 8. Indeed, the distinction is recognized in the wording of the death certificate form

itself which, on line 22a, calls for an "opinion" by the medical examiner as to whether death resulted from natural causes, accident, suicide, homicide, or by an "undetermined manner," the "opinion" being distinct from the other facts required to be recited in the medical certification. *See* 41 Op. Att'y Gen. 242 (1956), noting that while it is not within the province of medical examiners to determine the "manner of death," nevertheless it is incumbent upon them in completing the form to state their "opinion" on the question. We conclude therefore that that part of the death certificate setting forth the medical examiner's "opinion" that the testator's death resulted from suicide was not admissible in evidence, as held by Judge McCullough.

### III

Appellant next contends that the trial court erred in refusing to admit into evidence medical records of the testator from 1950-1951 and from 1962-1963, as well as medical testimony with reference thereto. She claims that the proffered medical records and testimony would "paint a picture of a man who had been certified permanently insane by the United States Navy, schizophrenic reaction, paranoid type, and discharged on that basis in 1952"; that such proffered records and testimony would show that in 1963 when examined by Dr. Williams, the testator was suffering from psychosomatic complaints and was diagnosed as having schizo-depression. Appellant maintains that it was her intention to show by the medical history that the testator suffered from delusional behavior starting in 1950; that the behavior was never treated; that the testator "had an episode reported in 1962 and early 1963"; and that he continued to exhibit delusional behavior which culminated in his focusing the delusions on his wife and child.

None of the witnesses testifying about the testator's medical records were prepared by personal knowledge to connect his past medical history to the will executed

many years later on July 12, 1971, although appellant did make the proffer that she would later produce a psychiatric expert to tie all the evidence together to show "that this will was the product of insane delusion, that he was suffering from delusions, and that his character was delusional."

In sustaining appellee's objections to the admissibility of all such evidence, the trial court ruled that none of it was admissible "because of the remoteness in time." Since it is likely that these evidentiary questions will present themselves again upon retrial of the case, we shall consider them in an effort to be of assistance to the trial judge.

In cases concerning general testamentary capacity, we have recently reaffirmed the long-standing rule,

> ". . . that while testimony tending to establish competency may relate to periods preceding or succeeding the execution of the will, testimony tending to establish incompetency must reasonably relate to the date of execution . . . ." *Webster v. Larmore,* 268 Md. 153, 164, 299 A. 2d 814, 820 (1973).

Of course, in any challenge to testamentary capacity, the nature of the insanity claimed will largely determine how remote the evidence may be, Page, *supra,* § 29.58 at 538. We are not persuaded, however, to announce a different rule in cases, as here, where the alleged testamentary incapacity is based on the existence of an insane delusion. In the instant case, the testator's proffered past psychiatric history concerned symptoms not shown to be within the legal definition of an insane delusion; further, the symptoms were unconnected to the specific insane delusion claimed to have invalidated the will. As Judge McCullough so cogently noted, the rejected evidence predated the testator's association with appellant, and any "delusions" harbored during that period could not possibly have related to her. We think the testator's

history twenty years ago shows no more than an "indefinite future expectation" of little probative value and great potential prejudice. *Cf. Waple v. Hall,* 248 Md. 642, 657, 238 A. 2d 544, 551-52 (1968) ; *Jackson v. Jackson,* 249 Md. 170, 238 A. 2d 852 (1968).

Nor do we think that the conclusions recited in the testator's naval records (1951) bring this case within the rules applicable where a finding of permanent insanity has been made. *See Arbogast v. MacMillan,* 221 Md. 516, 158 A. 2d 97 (1960) ; *Acker v. Acker,* 172 Md. 477, 192 A. 327 (1937). The proffered Navy records indicate, in part:

> ". . . (5) his [the testator's] disability is considered to be twenty (20) per centum in accordance with the standard schedule of rating disabilities in current use by the Veterans Administration, Code Number 9003 (Dementia praecox, paranoid type, *in partial remission,* with definite impairment of social and industrial adaptability 30% but that he suffered from the illness with slight impairment 10% at the time of his recall to active duty) ; and that
> "(6) accepted medical principles indicate that his *disability is of a permanent nature.*" (Emphasis added.)

In *Townshend v. Townshend, supra,* it was alleged by the caveators ". . . that upon the subject of the disposition of his estate, the said . . . [testator] always thought and believed, that he was acting under the immediate agency of the Almighty, and under the conviction, that he had seen and conversed with God face to face, and that he had been told by God, to make such a will . . . ." We there held at page 31 that the maxim *"semel furibundus, semper furibundus presumitur"* ("once insane, presumed to be always insane") is neither unqualified nor of universal application, and recognized the distinction between temporary and habitual delusion with re-

612

spect to the presumption. We noted in that case that the delusion claimed to have invalidated the will (personal conversations with God) was the same delusion claimed to have existed, at different intervals from 1816 to 1842, and during the year 1845, and on the date of the execution of the will in 1846. We think the presumption of continuation of permanent delusion is subject to the qualification that the prior permanent delusion must be of the same character as that delusion claimed to have invalidated the will. Therefore, the evidence of the testator's general delusional behavior and psychosomatic symptoms in the circumstances of the instant case, antedating by many years the execution of the will in question, does not constitute probative evidence of the existence on July 12, 1971 of an insane delusion within the testator's mind that his wife was unfaithful.

*Judgment reversed; case remanded for a new trial; appellee to pay costs.*