914 A.2d 184

**James J. DOUGHERTY, IV**

v.

**Janet C. RUBENSTEIN, Personal Representative of the Estate of James J. Dougherty III.**

**No. 2570, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

Jan. 4, 2007.

Frederick J. Hatem, Jr., Bel Air, for appellant.

E. Pete Summerfield, Owings Mills, for appellee.

Panel EYLER, DEBORAH S., ADKINS and SHARER, JJ.

EYLER, DEBORAH S., J.

The "insane delusion rule" of testamentary capacity came into being almost 200 years ago, as the invention of British jurists in *Dew v. Clark,* 162 Eng. Rep. 410 (Prerog.1826). The rule was devised to cover a gap in the existing law, which held that "idiots and persons of non-sane memory" could not make wills, *see* 34 & 35 Hen. 7, ch. 5 (1534), but accepted as valid the will of a testator "who knew the natural objects of his or her bounty, the nature and extent of his or her property, and could make a 'rational' plan for disposition, but who nonetheless was as crazy as a March hare[.]" Eunice L. Ross & Thomas J. Reed, *Will Contests* § 6:11 2d. (1999).

In the *Dew* case, a father insisted that his grown daughter, who by all accounts was a well-behaved, sweet, and docile person, was the devil incarnate. The father's wife had died in childbirth, and so as a young child the daughter was raised for the most part away from the father, by nannies and in boarding schools. The father's peculiar thinking about her first manifested itself when, in response to a letter reporting that the child was suffering "chilblains" that were "gross," the father went on a tirade, sending letter after letter insisting that the child was "gross" in every way.[1]

By the time his daughter was 8 or 9 years old, the father spoke of her only as wicked, having vices not possible of a girl that young, depraved in spirit, vile, of unequaled depravity, deceitful, and violent in temper. He told others that she was a child of the devil and a "special property of Satan." *Id.* at 426. When the child came to live with him, he treated her as a servant and physically tortured her.

In 1818, the father made a will that disinherited his daughter. Three years later, he was the subject of a writ *"de lunatico inquirendo"* and was declared by a court of chancery to be of unsound mind. He died later that year.

In a caveat proceeding by the daughter, the evidence showed that the daughter was known by all for her good disposition and that the father had boasted to others that he lavished his daughter with love and material items, when the exact opposite was true. The probate court found that, although in 1818, when the will was made, the father's behavior was usual in all respects, except toward his daughter, his warped thinking about her was a delusion that "did and could only proceed from, and be founded in, insanity." *Dew, supra*, 162 Eng. Rep. at 430. The court further found that the father's "partial insanity" or "monomania"—insanity about a particular subject—about the evil nature of his daughter had caused him to disinherit her. On that basis, the court held

---

1. Chilblains are inflammatory sores on the hands or feet that can develop from contact with water in cold weather.

that the father had been without testamentary capacity when he made his will, and set the will aside.

Within a few years of the decision in *Dew v. Clark,* the insane delusion rule made its way into will contest cases in the United States, first appearing in the Maryland law of estates and trusts in *Townshend v. Townshend,* 7 Gill. 10 (1848).[2] Since then, appellate opinions about the insane delusion rule have been a rarity in this state—with seven squarely addressing the issue, the last of which was published by the Court of Appeals in 1973.

In the case before us, James J. Dougherty, IV ("Jay"), the appellant, invoked the insane delusion rule before the Circuit Court for Harford County, sitting as the Orphans' Court, in an effort to set aside the June 9, 1998 Will of his father, James J. Dougherty, III ("James"), the decedent, which disinherited him. Jay is James's only child. According to Jay, James's Will was the product of an insane delusion that Jay had stolen his money. The Will named James's sister, Janet C. Rubenstein, the appellee, personal representative ("PR") of James's estate and bequeathed virtually all of James's assets to Rubenstein and his two other sisters, Elizabeth J. Hippchen and Dorothy D. Schisler. The estate was comprised mainly of James's house, valued at about $200,000.[3]

---

**2.** The *Townshend* case is a startling example of the changes in American society and law in the past 200 years. There, a testator slave-owner made a will in which he freed his slaves and bequeathed all of his property to them. When he died, his relatives brought a caveat proceeding, seeking to have the will set aside. The evidence disclosed, prophetically, that the testator had claimed to have spoken "face to face" with God, who directed him how to dispose of his property "for the safety of his soul." *See Townshend, supra,* 7 Gill. at 15. The relatives argued that the testator was laboring under an insane delusion that God wanted him to free his slaves and give them his property, and that that delusion produced the will. A jury in the caveat proceeding found in favor of the caveators. The Court of Appeals reversed on evidentiary issues and remanded the matter for further proceedings.

**3.** James left his model airplane collection to a friend and fellow miniature aircraft operator.

James died on October 29, 2004, at age 59, of congestive heart failure. On December 10, 2004, Jay filed a petition for judicial probate in the Circuit Court for Harford County, sitting as the Orphans' Court, asking that he be named PR of the Estate, in place of Rubenstein, and that the Will not be admitted into probate. He filed a list of interested persons that included his three paternal aunts. On December 14, 2004, Rubenstein delivered a copy of James's Will to the Register of Wills.[4]

On February 17, September 29, and September 30, 2005, the orphans' court held an evidentiary hearing on the issue of whether James had had the requisite testamentary capacity to make his Will. Three witnesses, including Rubenstein, testified so as to establish the existence of the Will. Jay then went forward with his evidence challenging the Will; he testified and called six witnesses. In rebuttal, Rubenstein testified and called six rebuttal witnesses.

The evidence, viewed in a light most favorable to the verdict, showed the following. James and Jay had a rocky father-son relationship over the years. When Jay was a teenager, James divorced Jay's mother. That led to a four-year estrangement between the two, beginning in 1986, when Jay was 18 years old. In 1990, at the urging of a friend, Jay reinitiated contact with his father. The two were close for the next seven years. During that time, Jay talked to James by telephone daily and visited him regularly.

On October 26, 1990, James executed a Last Will and Testament that appointed Rubenstein as PR and left his estate to Jay.

Throughout the 1990's, James's health deteriorated due, in large part, to alcohol abuse.[5] On several occasions, he experi-

---

4. The orphans' court docket entries reflect that Rubenstein sought to file a request to open the estate at that time. The clerk's office informed her that a petition for judicial probate already had been filed by Jay and that she would receive notice of a hearing in the matter.

5. There was testimony that James was in the habit of drinking one to two bottles of gin a day.

enced breathing difficulties that necessitated a trip to the emergency room. Eventually, he developed a dependency on certain prescription narcotics. At one time, he was admitted to an in-patient substance abuse program, but left before completing it.

On March 20, 1996, James executed a Power of Attorney appointing Jay as his attorney-in-fact. On January 11, 1997, James designated Jay as the primary beneficiary of his life insurance policy.[6]

The chain of events most immediately relevant to the issue on appeal began on December 9, 1997, when James suffered a minor stroke and was admitted to Fallston General Hospital. He was diagnosed with congestive heart failure and dilated cardiomyopathy (an enlarged heart caused by alcohol abuse). During the hospitalization, James often was disoriented and confused and had trouble expressing himself and understanding what was being said to him. He was rarely oriented to where he was or what day or time it was.

On December 18, 1997, the doctors at Fallston General transferred James to Harford Memorial Hospital's psychiatric unit for evaluation. James's confused state of mind and inability to communicate persisted during his stay at Harford Memorial. His speech was garbled. He was observed to be prone to confabulation and paranoia.

Linda Freilich, M.D., an internist, was in charge of James's medical care during his Harford Memorial admission. She diagnosed him with dementia. Dr. Freilich and a second doctor, Lakshmi P. Baddela, M.D., executed "Physician's Certificate of Disability" affidavits, attesting that James was suffering from dementia, that the condition was "lifelong" or "permanent," and that:

[D]ue to the present condition of dementia, he is without sufficient capacity to consent to the appointment of a guardian of his person and property and affairs or to consent to

---

**6.** James's former wife and Jay's mother, Marilyn Tescteman, was designated as the contingent beneficiary.

the care and confinement of his person or the management of his property and affairs[.]

Dr. Freilich recommended that James be placed in a nursing home. Jay and his wife Christy decided instead to place him in the Cantler's Personal Care Home ("Cantler Home"), which the doctors referred to as a boarding home. James adamantly objected, insisting that he be returned to his own house to live.

On January 5, 1998, James was discharged from Harford Memorial and was transported to the Cantler Home. There, he was assigned a small private bedroom with access to a common area and to a bathroom that he shared with three other residents. The other residents of the Cantler Home were considerably older than James, who was 52.

By all accounts, James was miserable at the Cantler Home. He complained incessantly to his sisters, his mother, his friends, and Jay and Christy about being there. He told his sisters that he did not have access to the telephone because it was located in a locked area of the home. When Richard Hodges, an old friend, visited James at the Cantler Home, the first thing James said was that he wanted help to "get out." James told him that the owners of the home kept the residents locked downstairs, even for meals. James said he had asked Jay and Christy to "get me out of here," but they would not, because they wanted "to keep me here."

James's sisters and his mother visited him at the Cantler Home and were disturbed by the conditions they saw. James was in a small area sitting on a hard chair. The first thing he said when they walked in was, "Get me out of here before I go crazy like the rest of them." One of the sisters sat on a chair not realizing it was covered with urine from another boarder.

Every other day, Jay tried to visit James at the Cantler Home. James "wanted nothing to do with [him]," however, because James was angry that Jay had placed him in the home instead of letting him move back to his own house. About a week after James moved into the Cantler Home, Jay and Christy left for an annual five-day ski trip with Christy's

family. While they were away, Rubenstein removed James from the Cantler Home and returned him to his house.[7]

When Jay and Christy returned from their trip, they learned that James was back at home. They went to see him. Jay had started handling his father's financial affairs when James was admitted to the hospital, and therefore was in possession of all of James's financial records. Jay and Christy brought the financial records with them because James "needed to take [them] back over." James lashed out at Jay, accusing him of stealing his money and saying that, to James, Jay "didn't exist." Jay tried to show James the financial records, to prove that nothing had been stolen, but James would not look at the records or listen to what Jay had to say.

Over the next few weeks, Jay tried to reason with James, but James ignored him. He insisted that Jay had stolen money from him. James told Jay, "As far as I'm concerned, you are dead." That was the last time the two saw each other.

On January 23, 1998, James executed a new Power of Attorney appointing Rubenstein as his attorney-in-fact. A week later, James came under the care of Richard DeSantis, M.D., for whom Rubenstein was working as a secretary. Dr. DeSantis is an internist and endocrinologist. For the next two years, Dr. DeSantis treated James's heart condition. According to Dr. DeSantis, James did not exhibit any symptoms of dementia aside from some minor speech difficulties, which could have been caused by his stroke.

In late spring of 1998, James met with Ed Seibert, a lawyer and longtime friend, and asked him to draft a new will for him.[8] There was no evidence that anyone encouraged or

---

7. Rubenstein testified that she took James to his home, but found that the electricity was off and there was no food in the house. For that reason, she took him to her home temporarily while she arranged for the electricity to be restored.

   Jay and Christy testified that the electricity was never shut off at James's house.

8. Seibert testified that he could not remember the exact date, but that it was shortly before the Will was executed (June 9, 1998).

urged James to see a lawyer or assisted him in doing so. James went to Seibert's office by himself.

Seibert testified that, when he and James met, James's demeanor was "just as lucid as you and I." He described his conversation with James as follows:

It seemed to be perfectly normal up to a point. The point I am talking about has to do with the antipathy he generated or seemed to be suffering toward his son.

I told him, Look—he didn't want any part of his son in the Will. At that time I said, [']Look, [James], you should consider this twice. Don't leave him out. Leave him something. Put his name in it. Do something. You can't, because he is your only heir, really.[']

So I did admonish him about that, but he was bound and determined to leave [Jay] out altogether. . . . I wanted to know why, and all he told me was that his son had cleaned out his bank account.

I know nothing about how that was done. I am just saying what he told me. [Jay] also had placed him somewhere where he was virtually in a prison and he couldn't get out, and it was a terrible thing for him, and it affected him badly. So he didn't want [Jay] remotely mentioned, or even indirectly referred to in that Will. So I did what he asked me to do.

On June 9, 1998, James returned to Seibert's office to execute his new Will. Seibert's daughter, Heather, and his daughter-in-law, Susanne Reising, signed as witnesses. Both described James's demeanor that day as normal. According to Seibert, from what he saw, there was no reason to think that James was not competent to make his Will or that anyone had exerted undue influence over him to get him to change his Will.

From 1998 until his death in 2004, James lived alone. There was much conflicting testimony about his mental state during those years. The sisters, a nephew, and several family friends testified that James's mental state improved dramatically once he left the Cantler Home and that, from then on, he

essentially cared for himself. Two family friends and Jay's stepfather testified that James was not the same person he had been before the late 1997 hospitalizations, and that he required considerable outside assistance in his daily activities. The evidence showed that, during this time period, James drove a car, wrote his own checks, and dressed and groomed himself. Several witnesses testified that James devoted time to his favorite hobby of flying model airplanes.

James complained to almost all of his friends and family members that Jay had stolen his money. Fred Visnaw, the son of a close friend of James, witnessed many conversations between his own father and James about James's belief that Jay had stolen money from him. On three occasions, Visnaw's father tried to reason with James about these thoughts, but James's mind was made up. On one occasion, Visnaw himself tried to intervene with James on Jay's behalf, to no avail.

Another of James's friends, Hodges, testified that James told him he was going to "cut [Jay] out" because Jay had stolen from him. Two of James's sisters, Rubenstein and Schisler, also testified that they were aware that James thought that Jay had stolen money from him. The parties stipulated, however, that there was absolutely no evidence that Jay had ever actually stolen any money from James.

James also continued to complain to many of his friends and family members that Jay had put him in the Cantler Home against his wishes. He described the Cantler Home as a prison. He believed that Jay had sent him there to live permanently.

James died on October 29, 2004, never having reconciled with his son. Jay was not notified of his father's death. There was no obituary published. Jay learned of his father's death through a friend, in early December of 2004.[9]

---

**9.** According to Jay, he was unable to collect on James's life insurance policy because he did not file his claim in time; and he did not file the claim earlier because he did not know his father had died.

Drs. Freilich and DeSantis each testified at trial and opined about James's mental state in the months before and after June 1998, when the Will was executed. Dr. Freilich opined that James was suffering from dementia; Dr. DeSantis opined that he was not.

In closing, counsel for Jay argued that the Will should not be admitted into probate because James made it while under the influence of an insane delusion, *i.e.*, that Jay had stolen his money. Counsel for Rubenstein argued that the evidence showed that James was competent to make the Will and that Jay had not met his burden to overcome the legal presumption that James was sane when he did so.

The judge ruled from the bench. He found that when James was a patient at Harford Memorial in late 1997–early 1998, he clearly "had no capacity to execute a Will." The judge rejected Dr. Freilich's opinion, however, that James had dementia and that it was permanent and progressive. He found that, after James was released from the hospital, in early January 1998, he improved substantially, and was able to care for himself. He concluded that James's recovery and ability to take care of himself for six years before he died were inconsistent with a diagnosis of permanent and progressive dementia; and that Dr. Freilich probably had mistaken the acute effects of the stroke and alcohol withdrawal for dementia.

The judge further found that, when James executed the Will, on June 9, 1998, he "was lucid, he was coherent, he understood the extent of his assets and the object of his bounty, except for the [possible] issue of [an] insane delusion[.]" He then explained his understanding of that issue:

Was this Will the product of an insane delusion? Even if [James] was competent by being coherent and lucid, if the Will was the product of an insane delusion, then the Will is invalid. Here [James] had the belief that Jay stole from him, and if that was an insane, untrue delusion, that would, I think, invalidate the June '98 Will that disinherited his son, Jay.

*Under the law that's been quoted to me and I have consulted, the delusion, or the wrong impression, ... the incorrect fact must be the product of a mental disease.* The allegation that Jay stole from him came after [James] got out of the hospital. In point of fact, his son did not steal from him, and that was a false belief on the part of the testator. I think the false belief caused [James] to make a new Will disinheriting Jay, and [he] was also prompted by the fact that he was angry with his son for putting him in the Cantler home, and that was not a false belief.

*Is the false belief that his son stole from him the product of a mental disease? That's the question I have to answer. If it is, then it's going to invalidate the Will. If it is not, then the Will stands, given the other findings I made.*

(Emphasis added.)

The judge reiterated that he could not accept Dr. Freilich's opinion about dementia and therefore "can't go on and then say [James's] irrational belief about his son's theft was the product of a mental disease." In all likelihood, the judge found, James's incorrect belief about his son "was the product of a rigid personality and a stubborn mind." The judge concluded:

I think [James] made up his mind his son had done something wrong, and he just never was going to change his mind about that. But I don't find that the evidence before me establishes that that delusion or incorrect belief was the product of a mental disease, so I will admit the Will of June 9, 1998, to probate.

On September 30, 2005, the orphans' court issued a written "Judicial Probate Order" appointing Rubenstein PR of the Estate and admitting the Will to probate. The order was docketed on October 11, 2005. Jay noted a timely appeal to this Court.[10]

---

**10.** Md.Code (2002 Repl.Vol.), section 12–501 of the Courts and Judicial Proceedings Article permits an appeal from a final decision of the orphans' court to this Court.

## DISCUSSION

The sole issue for decision in this appeal is whether the trial judge erred in concluding that the Will was not the product of an insane delusion on the part of the testator.

Jay argues that the court committed legal error by requiring proof not only that James was suffering from an insane delusion that produced the Will, but also that the delusion was caused by a mental illness. He further argues that the evidence adduced at trial compelled a factual finding that, when James made his Will on June 9, 1998, he was experiencing an insane delusion that he (Jay) had stolen his money; and that the Will was a product of that insane delusion. That being so, the court was obligated to set the Will aside.

Rubenstein counters that the orphans' court properly rejected Dr. Freilich's opinion that James had been suffering from dementia; and the evidence supported the judge's finding that, on June 9, 1998, James was competent to execute the Will. Alternatively, Rubenstein asserts that, even if the orphans' court erred in finding that James's mistaken belief was *not* an insane delusion, that error was harmless, because the court also found that James's decision to disinherit Jay was based in part upon a true belief: that Jay had placed him in the Cantler Home against his wishes.

We review the factual findings of the orphans' court for clear error. *Shapiro v. Marcus*, 211 Md. 83, 88–89, 124 A.2d 846 (1956); *Bourne v. Lloyd*, 100 Md.App. 575, 581, 642 A.2d 270 (1994). Its legal conclusions, however, are reviewed *de novo*. "The standard, or test of testamentary capacity is a matter of law" while the question of "whether the evidence in the case measures up to that standard is ... a matter of fact[.]" *Johnson v. Johnson*, 105 Md. 81, 85, 65 A. 918 (1907).

"A will, although facially valid, cannot stand unless the testator was legally competent." *Wall v. Heller*, 61 Md.App. 314, 326, 486 A.2d 764 (1985); *see also* Md.Code (2001 Repl. Vol.), § 4–101 of the Estates and Trusts Article ("ET") (stat-

ing "[a]ny person may make a will if he is 18 years of age or older, and legally competent to make a will").

The law presumes that every person is sane and has the mental capacity to make a valid will. *Wall, supra,* 61 Md.App. at 327, 486 A.2d 764; *see also* Sykes, *Contest of Wills,* § 63 (1941); *cf.* Richard A. Lord, 5 *Williston on Contracts,* § 10:8 (4th ed.) (contracting party presumed to have capacity). To rebut that presumption, one challenging a will for lack of testamentary capacity must prove either that the testator was suffering from a permanent insanity before he made his will, and therefore would have been insane when he made the will; or, although not permanently insane, he was of unsound mind when he made the will. *Wall, supra,* 61 Md.App. at 326–27, 486 A.2d 764; *Slicer v. Griffith,* 27 Md. App. 502, 510, 341 A.2d 838 (1975). The latter inquiry is to be decided from an assessment of the testator's external acts and appearances at that time:

> It must appear that at the time of making the will, [the testator] had a full understanding of the nature of the business in which he was engaged; a recollection of the property which he intended to dispose and the persons to whom he meant to give it, and the relative claims of the different persons who were or should have been the objects of his bounty.

*Ritter v. Ritter,* 114 Md.App. 99, 105, 689 A.2d 101 (1997) (quoting *Sykes, supra,* at § 61).

A testator's "insane delusion," also called "monomania," is in the law a type of unsoundness of mind that will invalidate his will, for lack of capacity, if the delusion produced the disposition made in the will. The testator's delusion must have been *insane* and his will must have been a consequence of the insane delusion, however. *Benjamin v. Woodring,* 268 Md. 593, 601, 303 A.2d 779 (1973). *See also Sellers v. Qualls,* 206 Md. 58, 66, 110 A.2d 73 (1954) (holding that testatrix's delusion that her sister tried to poison her, even if insane, did not control the making of her will and therefore will would not be set aside on that basis); *Brown v. Fidelity Trust Co.,* 126

Md. 175, 182–83, 94 A. 523 (1915) (holding that even if grantor of trust was operating under an insane delusion when she disposed of certain property, the trust would not be set aside because there was no evidence that the trust resulted from the delusion).

The Court of Appeals has said that an "insane delusion" is "a belief in things impossible, or a belief in things possible, but so improbable under the surrounding circumstances, that no man of sound mind could give them credence." *Johnson, supra,* 105 Md. at 85–86, 65 A. 918. It also has defined the term to mean "a false belief for which there is no reasonable foundation ... concerning which [the testator's] mind is not open to permanent correction through argument or evidence." *Doyle v. Rody,* 180 Md. 471, 479, 25 A.2d 457 (1942). Eccentricity, peculiar beliefs (such as in spiritualism or healing powers), and hostility or aversion to one relative or another are not, standing alone, insane delusions. *See Brown v. Ward,* 53 Md. 376 (1880) (testatrix who spoke to spirits, believed they could heal diseases, did not believe in the Bible, and despised some of her relatives was not suffering from an insane delusion when she made her will).

"Insane delusion" or "monomania" insanity is not a general defect of the mind. It is an insanity directed to something specific, that is, a particular person or thing. A testator can be laboring under the influence of an insane delusion while otherwise acting and appearing competent. *Benjamin, supra,* 268 Md. at 601, 303 A.2d 779 (quoting *Doyle, supra,* 180 Md. at 477–78, 25 A.2d 457) ("It is settled law in this State '... that when a [will] is the direct consequence ... of the testator's delusion ... the court should hold that he did not possess testamentary capacity, although he may have been rational and sane on other subjects.' "); *Doyle, supra,* 180 Md. at 478, 25 A.2d 457 (quoting *Banks v. Goodfellow,* 5 L.R.Q.B. 549, 560 (1870)) ("there often are ... delusions, which, though the offspring of mental disease and so far constituting insanity, yet leave the individual in all other respects rational, and capable of transacting the ordinary affairs and fulfilling the duties and obligations incidental to the

various relations of life"); *Johnson, supra,* 105 Md. at 86–90, 65 A. 918 (approving the trial court's instruction that the decedent could have been suffering from an insane delusion despite the jury finding that he "conducted his ordinary business with shrewdness and apparent discretion, and did not make any exhibition of insanity to many persons").

Before analyzing the issues raised by Jay on appeal, it will be helpful to review the two Maryland appellate cases in which a decision to set aside a will on the ground of insane delusion testamentary incapacity has been affirmed, and the one Maryland case in which a "directed verdict" in favor of a caveatee was reversed, upon a determination that the evidence adduced by the caveator was legally sufficient to make the insane delusion issue one of fact.[11]

In *Johnson v. Johnson,* 105 Md. 81, 65 A. 918 (1907), the evidence showed that the testator and his wife married in 1898, and then had two children. The testator already had four children from a prior marriage. Until the wife's second pregnancy, the couple and their child lived happily and the testator showed pride in his family and fondness for them. Suddenly, and for no apparent reason, the husband started abusing the wife and accusing her of being unfaithful. He insisted that their child and the unborn baby were not his. After the second child was born, he denied paternity of both children and treated his wife and the children with such harshness, hostility, and aversion that the wife was forced to leave the home. The evidence showed that there was no rational basis whatsoever for the testator's obsessive belief about his wife and children.

In late 1904, the testator made a will that left nothing to his wife and two youngest children; his entire estate was bequeathed to his four oldest children from his first marriage. The testator died eight months later, in August 1905. The wife challenged the will on the ground that the testator was laboring under the insane delusion that his two youngest

---

**11.** In the 1984 revision of the Maryland Rules, the "directed verdict" became a motion for judgment. *See* Rule 2–519.

children had been fathered by someone else. The parties agreed that the will was the product of this false belief. Their dispute centered upon whether the false belief was an insane delusion.

The Court held that a testator's hostility or aversion toward a particular close family member (or members) is not alone sufficient to prove insanity; however, such an aversion that is without cause and is founded upon a delusion may be. *Johnson, supra,* 105 Md. at 88, 65 A. 918 (quoting *Brown, supra,* 53 Md. at 387–88). In deciding that the evidence supported a finding that the testator's delusion was insane, the Court relied upon *Bell v. Lee,* 28 Grant, Ch. R.U.C. 50 (1883), in which the Chancery Court of Upper Canada held that "a fixed and unalterable conviction on the part of the testator that his child was illegitimate was evidence of an insane delusion, when it appeared that there was not a scintilla of evidence to support such a belief." 105 Md. at 88, 65 A. 918. In *Bell,* the court, quoting Sir James Hannen in *Boughton v. Knight,* L.R. 3 Prob. & Div., 64, explained:

"It is unfortunately not a thing unknown to parents, and in justice to women I am bound to say that it is more frequently the case with fathers than mothers, that they take unduly harsh views of the character of their children, some especially. That is not unknown. But there is a limit, beyond which one feels that it ceases to be a question of harsh, unreasonable judgment and character, and that the repulsion which a parent exhibits towards one or more of his children must proceed from some mental defect in himself. It is so contrary to the whole current of human nature that a man should not only form a harsh judgment of his children, but that he should put that into practice so as to do them injury, or deprive them of advantages which most men desire above all things to confer upon their children. I say there is a point at which such repulsion and aversion are in themselves evidence of unsoundness in mind."

*Johnson, supra,* 105 Md. at 87–88, 65 A. 918.

The *Johnson* Court found that the testator had been suffering from an insane delusion, adopting the view of the New

York Court of Appeals, in *Am. Seamen's Friend Soc'y v. Hopper*, 33 N.Y. 619, 624 (1865):

> "If a person persistently believes supposed facts, which have no real existence except in his perverted imagination, and against all evidence and probability, and conducts himself, however logically, upon the assumption of their existence, he is, so far as they are concerned, under a morbid delusion; and delusion in that sense is insanity. Such a person is essentially mad or insane on those subjects, although on other subjects he may reason, act and speak like a sensible man."

*Johnson, supra*, 105 Md. at 88, 65 A. 918.

*Doyle v. Rody*, 180 Md. 471, 25 A.2d 457 (1942), concerned a trust bank account established by a grantor shortly before his death. The grantor had a wife, a brother, and nephews and nieces. He had been separated from his wife for two years, during which he lived in a boarding house. In late 1939, at the age of 68, he was briefly hospitalized and was diagnosed with senility and hardening of the arteries. Two days after being discharged from the hospital, he went to Westminster to visit his brother.

A few days later, the grantor walked into a police station in Baltimore City, in a dazed and confused state, claiming that he had been robbed. He was carrying with him some medicines, $26.47 in cash, a bankbook showing an account with a balance of $11,000, and a piece of paper bearing his niece's address. The police contacted the niece, who with her husband retrieved the grantor from the station house and kept him at their house for the night, giving him food and drink.

The next day, the niece helped the grantor get organized and took him to his boarding house, where he wanted to be. When they arrived, he became insistent that his clothes had been taken away, when they had not. The niece called a doctor for assistance, but before help arrived the grantor ran away. He managed to return to his brother's house in Westminster. There, he insisted that his niece and her husband had "ganged up against [him]" and had held him at their

house against his will. *Doyle, supra,* 180 Md. at 474, 25 A.2d 457. He became obsessed with the thought that his niece and her husband had conspired to injure him and to rob him of his money. There was no basis in fact for this belief; on the contrary, the niece had treated the grantor kindly.

The brother in Westminster took the grantor to the bank and had him transfer his $11,000 into a new trust account, in both of their names, the balance to be paid at the death of either to the survivor. About a month later, the grantor died. The administrator of his estate brought suit, seeking a declaration that the trust account funds belonged to the estate and not to the brother. The chancellor found upon the evidence that, when the grantor established the trust account, he was operating under the insane delusion that his niece had stolen money from him; and the trust account benefitting the brother upon the grantor's death was the product of that delusion.

The Court of Appeals affirmed the decree, remarking:

Th[is] case falls within the definition of an insane delusion: a false belief, for which there is no reasonable foundation, and which would be incredible under similar circumstances to the same person if he were of sound mind, and concerning which his mind is not open to permanent correction through argument or evidence.

*Id.* at 479, 25 A.2d 457. The Court observed that the grantor's false belief that he had been robbed, which prompted his visit to the police station, became misdirected, for no reason, toward his niece and her husband, the only family members who actually had helped him. The Court drew a distinction between "eccentricities or peculiarities of behavior[,]" which are not sufficient in and of themselves "to constitute mental incapacity[,]" and a "delusion, which was calculated to pervert [a testator's] judgment and control his will in respect to the disposition of his estate." *Id.* at 477–78, 25 A.2d 457. When the latter is the case, "the court should hold that [the testator] did not possess testamentary capacity, although he may have been rational and sane on other subjects.... It has been specifically held by this court that violent dislike for one's near

relatives, when founded upon an insane delusion, may be proof of his insanity." *Id.* at 478, 25 A.2d 457.

In the most recent Maryland case addressing the insane delusion rule, the Court of Appeals reversed a "directed verdict" granted in favor of the caveatee in a will contest case. The Court held that the evidence adduced by the caveator at trial had been legally sufficient to make it a question of fact whether the testator was under the influence of an insane delusion when he made a will disinheriting his wife. In *Benjamin v. Woodring*, 268 Md. 593, 303 A.2d 779 (1973), the testator made his will about a month before he died from an overdose of prescription medication. In a handwritten note penned about five weeks before he died, the testator ranted about his wife's infidelity during and before their marriage and said that he would leave her nothing after his death, as punishment.

The testator never spoke of this with his wife directly. Instead, his manner toward her suddenly changed; he became withdrawn during the six months prior to his death. There also was evidence that the testator confided in a friend his belief that his wife had been unfaithful. The friend testified that he tried to persuade the testator that there was no truth to his belief, to no avail. There was no evidence whatsoever that the testator's wife ever had been unfaithful to him. The testator's false belief in his wife's infidelity was a preoccupation that seemed to have entered the testator's mind out of the blue, with no basis in fact.

The Court held that the testator's letter, the friend's testimony, and the evidence that there was no truth to the testator's belief about his wife constituted legally sufficient evidence to support a finding that the testator was laboring under an insane delusion that resulted in the disposition in his will; therefore, the issue of testamentary capacity should have been submitted to the trier of fact for decision.

The insane delusions in these three cases share common features. All were negative false beliefs about the character of a particular close relative of the testator that were not

connected to any reality or true experience, existing only in the testator's (or grantor's) mind. Even an illogical thought process or generalization could not link the negative false belief to some true fact about the subject of the delusion. Not only was there no evidence in any of the cases that the subject of the delusion had done whatever it was the testator was convinced he or she had done; there also was no evidence that the subject of the delusion had done *anything* negative toward the testator (or any one else) that could account, even irrationally, for the testator's wrath. The delusions did not suggest mistake, unreasonableness, confusion, stubbornness, poor judgment, denial, or willfulness; they only could be explained by a deranged mind.

■ Mindful of the above, we return to the case at bar. Jay's first argument is strictly legal. He maintains that the trial court erred by adding an element to the insane delusion rule and then basing its finding that there was not an insane delusion upon the absence of proof of that element. Specifically, he complains that the trial court not only required proof that James's delusion was insane and that it resulted in the disinheritance, but also that the delusion was caused by a mental disease. He argues that the controlling cases hold that proof that the testator was suffering from an insane delusion gives rise to a reasonable inference that he was mentally ill; and therefore the existence of a mental disease need not be separately proven. *See Johnson, supra,* 105 Md. at 88, 65 A. 918.

We do not read the trial judge's references, in his ruling, to a "mental disease" as injecting an additional element of proof into the insane delusion rule. The judge framed the question before him as whether James's "false belief" that Jay had stolen from him was "the product of a mental disease[,]" and ultimately found that the evidence did not show that James's "delusion or incorrect belief was the product of a mental disease[.]" It is clear that the judge was using "mental disease" and "insanity" interchangeably, and that his references showed his understanding that it is not sufficient that

the testator have held a false belief or a delusion; it also is necessary that the false belief or delusion was insane, i.e., the product of a mental disease. Indeed, in one state in which the courts have continued to use the somewhat antiquated medical label "monomania" to mean an insane delusion, the supreme court observed: "Monomania is *a mental disease* which leaves the sufferer sane generally but insane on a particular subject or class of subjects." *Boney v. Boney,* 265 Ga. 839, 839, 462 S.E.2d 725 (1995) (emphasis supplied). The court in the case at bar did not add an element to the insane delusion rule, and therefore did not commit legal error.

■ Jay next argues that the application of the insane delusion rule to the evidence adduced at trial compelled a finding that James disinherited him due to an insane delusion that Jay had stolen his money. Jay points out that there was no evidence that he had stolen James's money (or that any of James's money had been stolen), as the parties stipulated, and therefore James's belief plainly was false; that no amount of reasoning could get James to change his mind about his false belief, and James's mind was not open to being changed, even by records that would have shown conclusively that no money was missing; that the false belief arose soon after a hospitalization during which James was unable to understand what was being said to him or to communicate and was disoriented; that while James's functional abilities improved over time, after he was discharged from the Cantler Home, he could not overcome the false belief that Jay had stolen his money; and all of the evidence, and especially that of Mr. Siebert, a disinterested person, showed that James left nothing to Jay in his Will because he was convinced that Jay already had all of his money.

Beginning with the last point, we note that the orphans' court indeed found that James's false belief that Jay had stolen from him had caused James to disinherit Jay. The court observed that James also was angry with Jay for moving him into the Cantler Home but that "that was not a false belief"; and that, if the false belief (about stealing money) was an

insane delusion "then it's going to invalidate the Will. If it is not, then the Will stands, given the other findings I made." So, the court in fact found, as Jay argues it was compelled to find, that the delusion about his having stolen money prompted James to disinherit him.

We disagree, however, that the law of insane delusions compelled a finding by the orphans' court that James's delusion that Jay stole his money was an *insane* delusion. To be sure, James's delusion shared many of the characteristics of the insane delusions in the *Johnson, Doyle,* and *Benjamin* cases. James and Jay were close relatives, and Jay would be expected to have been the object of James's bounty. James came suddenly to believe that Jay had harmed him by stealing his money, when there was no evidence to support that belief, and he refused to hear the evidence that would refute it. James's false belief did not subside, but became central to his thinking about Jay, causing hostility and aversion.

This case is factually distinguishable from the three cases discussed at length above, however. In those cases, there simply was no explanation, whether or not rational, for the testator's sudden false belief, and therefore the delusion only could have come from within the testator's own mind. In this case, the delusion entered James's mind when he was a resident, not by choice, of the Cantler Home, which for him was a terrible experience that he blamed completely upon Jay. As James saw it, he was confined to a home similar to a nursing home, without privacy or access to a telephone, in the company of residents who were enfeebled by old age, and with no hope of being let out. The witnesses who testified about having visited James in the Cantler Home confirmed that the accommodations were insufficient for him and that he felt like he had been imprisoned—and that he was of the view that Jay had failed him by forcing him in and by not coming to his aid to get out.

From the time he arrived at the Cantler Home forward, James was convinced that Jay had betrayed him by not letting him go home instead. James's delusion that Jay also had

betrayed him by stealing his money was a generalization, albeit not a logical one, drawn from his true belief that Jay had been the decision-maker who had kept him in the Cantler Home until his sisters rescued him. In essence, this is what the trial judge found from the evidence: that James's delusion was an outgrowth of a stubborn conviction that Jay had "done something wrong" by "imprisoning" him at the Cantler Home. Although it was false, and it prompted James to disinherit Jay, it was not an inexplicable delusion that only could have come into being as the product of an insane mind.

The facts as found by the orphans' court did not compel a finding that James was suffering from an insane delusion, under the law of testamentary capacity. The court's finding that James was suffering from a delusion that Jay had stolen his money, but that the delusion was not an insane delusion, was a reasonable interpretation of the evidence. Accordingly, we shall not disturb it on appeal.[12]

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**

---

12. In his brief, Jay complains that the orphans' court did not place sufficient weight upon Dr. Freilich's testimony, supported by the hospital records, that James was suffering from dementia. There was opposing testimony, however, from which the court reasonably could find that James's addled state while in the hospital was not permanent dementia but was a temporary condition caused by his minor stroke and substance abuse withdrawal. To the extent that there was any argument by Jay as to whether James's Will should have been invalidated because, prior to executing it, he had become permanently insane due to dementia, the court's factual findings rejected that argument. It was the court's prerogative to make credibility findings; its determination that James did not have dementia was based upon its crediting the expert opinion of Dr. DeSantis, which it was entitled to do. *See, e.g., Banks v. Pusey*, 393 Md. 688, 697, 904 A.2d 448 (2006) (credibility determinations are within the discretion of the trial court).