926 A.2d 769

**Leon Augustus COSTLEY, Jr.**

v.

**STATE of Maryland.**

**No. 1013 Sept. Term, 2004.**

Court of Special Appeals of Maryland.

June 28, 2007.

Amy E. Brennan (Nancy S. Forster, Public Defender, on brief), Baltimore, MD, for Appellant.

Brian S. Kleinbord (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: DEBORAH S. EYLER, BARBERA, PAUL E. ALPERT, (Ret., specially assigned), JJ.

PAUL E. ALPERT, Judge (ret., specially assigned).

A jury in the Circuit Court for Carroll County (Michael M. Galloway, J.) convicted Leon Costley, Jr., appellant, of the first degree murder of Helga Nicholls, his former mother-in-law, and of wearing and carrying a weapon openly with intent to injure. Judge Galloway sentenced appellant to a life term of incarceration without the possibility of parole for the murder conviction and to a concurrent term of three years incarceration for the weapon offense. Appellant presents four questions on appeal:

I.  Did the suppression court err in denying his motion to suppress statements he made to the police?

II.  Did the trial court abuse discretion in refusing to ask the jury questions requested on *voir dire?*

III.  Did the trial court err in admitting the autopsy report and Dr. Fowler's testimony about the contents of the report in violation of the holding of *Crawford v. Washington?*

IV.  Did the trial court err in refusing to instruct the jury on second degree depraved heart murder and involuntary manslaughter?

We shall affirm.

## FACTS

### Motion To Suppress

Prior to trial, appellant filed a motion to suppress statements he made to State Police Corporals Bryan Pearre and Christina Becker. The motion was heard and denied by the Honorable Luke K. Burns, Jr.

State Police Corporal Bryan Pearre testified that at approximately 11:55 a.m. on August 14, 2002, he transported appellant from 1647 Old Manchester Road to the State Police Barracks in Westminster. Appellant was under arrest at the time. Cpl. Pearre secured appellant in the front seat of the police car, but did not advise appellant of his *Miranda* rights because he did not intend to question him about the crime.

While stopped at a traffic light, Cpl. Pearre retrieved a Maryland State Police Detention Log, on which personal information, such as name, case number, address, social security number, was to be recorded. Cpl. Pearce recounted:

I asked Mr. Costley what his social security number was and he was—he was sitting in the passenger seat slumped over basically lookin' out the window over to the right-hand side. He didn't acknowledge anything, so at that point, I nudged him on the shoulder a little bit and asked him what his social security number was and his comment was, "You

have my wallet, don't you?" And my—my exact words back to him was, "Yes, but why don't you make this easier on both of us and just give me the information I need?" Mr. Costley responded by, "I'm not telling you shit." I then responded with, "That's good, I wouldn't cooperate either if I was—bein' that you have the upper hand here." Mr. Costly then said, "You have the upper hand here, not me." And I made the comment, "You're right about that."

At that point the suspect stated, "Why don't you hit me?" My—my response was, "What?" as in asking him a question, what. At that point he said, "You heard me, why don't you hit me. That's all you people want to do anyway, hit the poor little black man." He took a short pause and then stated, "I'm glad that bitch is dead."

Cpl. Pearre did not make any more comments and ceased efforts to fill out the form at that time. He denied that he sought any information other than that needed for the form. He also denied that appellant had asked for an attorney.

Corporal Christina Becker testified that at around 1:55 p.m., she went to the holding cell area where appellant was incarcerated, introduced herself, and told appellant she was going to take him to an interview room "where we could talk." Appellant did not object. Cpl. Becker advised appellant of his *Miranda* rights by reading each right to him and asking if he understood them and whether he had any questions. Appellant said that he understood them and did not ask any questions. Cpl. Becker asked if he agreed to speak with her, and appellant said he did. Becker then asked him to sign the form, which he did.

According to Cpl. Becker, appellant was initially "somewhat agitated." He did not ask for medical treatment or make any other requests during the interview. She did not make any promises to appellant, nor did she threaten him or offer him inducements to talk to her. At approximately 4:00 p.m., appellant asked to speak with an attorney. Cpl. Becker did not ask him any more questions and returned him to his holding cell.

On cross-examination, Cpl. Becker agreed that it was possible that appellant "could have told not only Corporal Pearre, but some other troopers who had detained him," that "he wanted to speak to an attorney."

Appellant testified that when Cpl. Pearre began talking to him, he did not say anything. Appellant confirmed that Cpl. Pearre asked him his social security number, and that he had responded along the lines that Cpl. Pearre had indicated. According to appellant, he told Cpl. Pearre he was not going to talk to him and that he wanted to speak to a lawyer, but Cpl. Pearre continued to ask questions. Appellant also testified that he told the officer who took him to a cell that he wanted an attorney.

Appellant further testified that Cpl. Becker read him his rights, slid the paper across the desk, and told him to sign it. Appellant said that he did not pay attention when she read it, but denied that she read his rights aloud line by line, and asked him to sign or initial each. He said he signed the form because he thought it meant he would get an attorney. He explained that he "thought you needed an attorney before they interviewed you." He denied that he had made the comments Cpl. Pearre ascribed to him.

Defense counsel argued that Cpl. Pearre had "bait[ed] [appellant] into a conversation," and asked that the comments appellant made to him be suppressed. He further asked that the statements be suppressed "from that point forward, when he's already made that initial request for counsel at the station and in the car."

The suppression court denied the motion. After reviewing the evidence, it commented:

> There is certainly a question of credibility here which we feel should be resolved in favor of Cpl. Becker. Outside the testimony presented above the only other evidence is the short form 180 which stated: "I have read or have had read to me this explanation of my rights. I fully understand questions without consulting a lawyer or having a lawyer present at this time. My decision to answer questions is

entirely free and voluntary and I have not been promised anything nor have I been threatened or intimidated in any manner." This form is then signed at the bottom by the defendant. Defendant then proceeds to answer Cpl. Becker's questions for the next two hours before requesting an attorney. At this time the interview ceased.

The Court can find no error in the procedure followed by Cpl. Becker, and thus finds no merit in Defendant's motion to suppress the statements made to the officer. It should be noted at the hearing that Cpl. Becker never asked Cpl. Pearre or any other officer if Defendant requested an attorney prior to her interaction with him. Given Cpl. Becker's administration of *Miranda* prior to her questioning, the Court finds little significance in this fact.

## Trial

Kristina Costley (Kristy) [1] testified that she was married to appellant in 1995, and that they separated in September of 2000 and divorced in June of 2002. Appellant had adopted Kristy's daughter, Brittany Costley, shortly after the marriage, and Kristy and appellant had a son, Tyler Costley, together. In August 2002, appellant had supervised visitation with the children, and had not had a visit with them since November of 2001.

According to Kristy, appellant resented her mother, Helga Nicholls. She said appellant thought Ms. Nicholls was controlling her, that she was causing the separation between Kristy and him, and that she was keeping the children from him. She said that appellant felt that as a result of the divorce he lost his house, his children, his car, and her.

At around 7:50 on the morning of August 14, 2002, Kristy took her children to the Nicholls home at 1647 Old Manchester Road in Westminster so Ms. Nicholls could watch them while Kristy was at work. Appellant knew that Ms. Nicholls

---

1. Because three of the witnesses have the same surname, we shall refer to them by their first names.

watched the children because she had done so while he and Kristy were married. Although the home was "in normal array," there were tools in the kitchen because Mr. Nicholls was remodeling the bathroom.

On that same morning, appellant went to a Westminster car dealership and took a truck for a test drive. He headed off to a local Target store where, at 10:20 a.m., he bought a chef's knife and a pack of gum. At trial, the sales clerk from Target who had sold the knife identified appellant in photographs made from a store videotape of the transaction. When shown empty packaging the police had found in the truck appellant had taken for a test drive, the clerk agreed it looked like the package appellant had bought. The clerk confirmed that when appellant purchased the knife, the packaging was sealed.

Brittany Costley, who was twelve years old at the time of the incident, testified that at approximately 10:30 a.m. she was in the living room watching television, and "was halfway asleep" in a chair. She heard Ms. Nicholls scream. She saw appellant enter the house through the kitchen door and, without saying anything, approach Ms. Nicholls quickly and choke her. Ms. Nicholls tried to push appellant off but was unable to do so. Ms. Nicholls started to break away, but fell. Brittany went to the telephone and dialed 9–1–1. As Brittany was dialing, appellant pulled a knife from his pocket and stabbed Ms. Nicholls as she lay on the ground. Brittany dropped the phone and ran out the front door to a neighbor's house. As she ran, appellant saw her and called to her to wait. According to Brittany, Ms. Nicholls did nothing to defend herself.

When Brittany arrived at her neighbor's house, she was crying, "hollering and screaming," and holding herself. She told her neighbor, Barbara Reed, "My grandmother's been stabbed," and "She's going to die, My dad did it." She asked Ms. Reed to go into the Nicholls house and get Tyler, who was upstairs. Ms. Reed called 9–1–1.

Tyler Costley, who was six days shy of his sixth birthday at the time of the incident, testified that he was halfway up the

stairs to the bathroom when he heard his grandmother scream. He went downstairs and saw appellant stabbing his grandmother with a big knife. When appellant saw Tyler, he told him to go upstairs. Tyler complied. Appellant then went upstairs to Mr. Nicholls' bedroom. He had two knives when he came upstairs. According to Tyler, appellant gave him candy, "my grandma's money," and a chain from around his neck. Appellant tried to lock the door to Mr. Nicholls' bedroom with one knife and hid the other knife under Ms. Nicholls' bed.

On cross-examination, Tyler testified that, when appellant came to the house, he wanted to take him to his house. He said that there was an argument, and that Ms. Nicholls "started screaming." He said that appellant tripped her.

The State played 9–1–1 tapes between a State Police Operator and appellant and a crying Tyler while appellant was in the Nicholls home. Tyler told the operator, "My daddy shot and killed my grandma" "with a knife." Appellant denied that anyone in the house was hurt. Appellant told the operator, "I lost everything. I lost my house, I lost my car," "I lost my job, I don't have anything," "all because of her and her mother." He later said, "I lost everything because of my mother-in-law. She got involved and put up my house which was something that I didn't do."

First Sergeant Keith Runk, the commander of the State Police SWAT team, arrived at the Nicholls home around 11:45 or 11:50 a.m. that day for a hostage rescue. As he took his team upstairs, he heard a child yelling, "Help me. Help me," from a bedroom and saw appellant coming to the top of the stairs. The officer told appellant to lie on the floor, and, when appellant complied, placed handcuffs on him. Another officer took Tyler from the bedroom and handed him to another officer, who took him outside the house.

First Sergeant Mark Gibbons entered the kitchen to attempt to rescue Ms. Nicholls, but found that she was not breathing, had no pulse, and had "sustained injuries that were not compatible with life." Police officers collecting evidence

found a hammer under Ms. Nicholls' body, but no other tools in the area.

Two days after the murder, Kristy and Robert Nicholls were permitted to return to the Nicholls home. When they went into Mr. Nicholls' bedroom, Kristy "happened to look in his closet" and saw a shirt with blood all over it bundled up with a washcloth with blood all over it. She had not seen the shirt at her parents' house before. At trial, Kristy identified photographs of appellant wearing the shirt. In addition, Kristy found a Target receipt for a butcher knife and a pack of gum purchased the morning of the murder; it was crumpled up in the downstairs hallway. She turned the receipt over to the State Police. Robert Nicholls testified that when he returned to the house, several items were missing, including a hammer and a wooden-handled knife, a shirt and tennis shoes. He identified the shirt that appellant was wearing when he was arrested as being the shirt missing from his house.

Michael Forame, a former co-worker of appellant, testified that in November or December of 2001, he had a conversation with appellant in which appellant told him about "his wife and his children and losing his house and his car and everything and that he would stab his mother-in-law to death if it was the last breath he would ever draw."

After his arrest, appellant was taken to the State Police Barracks in Westminster, where Cpl. Becker spoke to him. The officer who completed the medical intake form noted bruising around the wrist and right and left arm, and the back shoulder, but no nicks, cuts or marks on his hand.

After appellant waived his right to remain silent and his right to an attorney, he told Becker that he had no permanent address, but had been living at the Boston Inn Motel since February of 2002. He said he was unemployed because of the stress in his personal life. He reported that he married Kristy Costley in June 1995, that they had one child together, Tyler, and that he had adopted Brittany, Kristy's daughter. He said that they had separated in September of 2000 and divorced in May 2002, and that all he had gotten was $4,700 in

cash, which represented the equity from a town home he and Kristy had bought. He said that he had lost his car and a motorcycle in the settlement.

Appellant also told Becker the following. He had initially shared custody of his children, but, in November 2001 "there were some issues with Court-ordered visitation" and he had not seen them since. He saw two causes for his divorce: money problems because Kristy controlled the money and was funneling off money for her mother to hold "in anticipation of her leaving him," and "the constant interference of Kristy's parents, Bob and Helga Nicholls, into their marriage." On the morning of the 14th, at approximately 9:45, he had gone to a car dealership and test driven a Chevy Silverado pickup truck, but he did not remember where he had driven the vehicle. He had entered the Nicholls house through the unlocked kitchen door, and did not see his children at first. He did not remember what had happened after that. He gave Tyler money, approximately $900, which was the remainder of his divorce settlement.

Cpl. Becker testified that appellant said he did not remember what happened, but then said he wished it had never happened. She said that appellant "never offered any explanation as to why he went there that day or any kind of argument or altercation." She reported that he made statements to the effect of "he should just be taken to jail," and "should be given the death penalty."

Additional facts will be set forth as necessary in our resolution of the questions presented.

## I. Motion To Suppress

Appellant contends that the suppression court erred in denying the motion to suppress the statements he made to Corporal Becker at the State Police barracks. He argues that his comment, "I'm not telling you shit," made to Cpl. Pearre while the corporal was driving him to the barracks, was an invocation of his right to remain silent which Cpl. Becker failed to "scrupulously honor." Appellant also asserts that his

statement to Cpl. Becker should be suppressed because the State did not rebut his assertion that he requested counsel before the interview.

The State counters that appellant did not make clear "his intention to remain silent in the face of police questioning" because when he told Cpl. Pearre "I'm not telling you shit," he was not being subjected to interrogation. The State also asserts that, even if appellant did invoke his right to remain silent, that invocation did not bar Cpl. Becker from asking appellant whether he would talk to them. It further asserts that the suppression court "credited the testimony of the police officers that Costley did not invoke his right to counsel prior to Corporal Becker's interview."

### Standard Of Review

■ In considering the circuit court's denial of a motion to suppress, we are limited to the record of the suppression hearing. *See Myers v. State*, 395 Md. 261, 274, 909 A.2d 1048 (2006); *State v. Green*, 375 Md. 595, 607, 826 A.2d 486 (2003); *State v. Collins*, 367 Md. 700, 706–07, 790 A.2d 660 (2002). We consider the evidence in the light most favorable to the prevailing party, in this case, the State. *See Green*, 375 Md. at 607, 826 A.2d 486; *Collins*, 367 Md. at 707, 790 A.2d 660.

■ We accept the suppression court's findings of first-level fact unless clearly erroneous, giving due regard to the court's opportunity to assess the credibility of witnesses. *See Swift v. State*, 393 Md. 139, 154, 899 A.2d 867 (2006); *Green*, 375 Md. at 607, 826 A.2d 486. We make our own constitutional appraisal as to whether an action taken was proper by reviewing the law and applying it to the facts of the case. *See Ornelas v. United States*, 517 U.S. 690, 696–97, 116 S.Ct. 1657, 1661–62, 134 L.Ed.2d 911 (1996); *Myers*, 395 Md. at 274, 909 A.2d 1048; *Collins*, 367 Md. at 707, 790 A.2d 660.

### Admissibility Of A Statement

■ The introduction of a confession as evidence against an accused at trial is permitted only after it is determined that

the confession was (1) "voluntary under Maryland nonconstitutional law, (2) voluntary under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and Article 22 of the Maryland Declaration of Rights, and (3) elicited in conformance with the mandates of *Miranda* [*v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)]." *Winder v. State,* 362 Md. 275, 305–06, 765 A.2d 97 (2001)(internal footnote omitted, alteration in original); *Ball v. State,* 347 Md. 156, 174, 699 A.2d 1170 (1997), *cert. denied,* 522 U.S. 1082, 118 S.Ct. 866, 139 L.Ed.2d 763 (1998). In this case, appellant asserts that the police did not comply with the requirements of *Miranda.*

### Invocation Of The Right To Remain Silent

In *Marr v. State,* 134 Md.App. 152, 759 A.2d 327 (2000), *cert. denied,* 362 Md. 623, 766 A.2d 147 (2001), this Court opined that Marr did not validly waive his Fifth Amendment right to counsel because the invocation occurred outside the context of custodial interrogation. *Marr,* 134 Md.App. at 173, 759 A.2d 327. The Court commented that "*Miranda's* safeguards were intended to provide protection against the inherent coerciveness of custodial interrogation." Quoting *Rhode Island v. Innis,* 446 U.S. at 291, 297, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297 the *Marr* Court commented that "[i]t is clear ... that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken in to custody, but rather where a suspect in custody is subject to interrogation." (Brackets and ellipses present in *Marr*). The *Marr* Court further noted that the principle was applicable to invocation of a suspect's right to remain silent as well as his or her right to counsel. *Id.* at 177, 759 A.2d 327.

The *Marr* Court also cited *McNeil v. Wisconsin,* 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) to the same effect. *Marr,* 134 Md.App. at 173–74, 759 A.2d 327.

The word "interrogation," as used in *Miranda,* "refers not only to express questioning, but also to any word or actions on the part of the police (other than those normally

attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 300, 100 S.Ct. at 1689.

In the present case, the suppression court concluded that there was nothing in Cpl. Pearre's conversation with appellant that "should have made the officer aware that his questions would likely elicit an incriminating response." We agree. The officer's comments might have been unwise, but the comments complained of were not questions and did not relate to the crime.

Even if we consider appellant's comments to be an invocation of his right to remain silent, that would not render the statements he made to Cpl. Becker inadmissible. In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the United States Supreme Court held that a defendant's invocation of his right to remain silent does not preclude later questioning for an indefinite period. *See id.*, 423 U.S. at 102–03, 96 S.Ct. at 326. The Court, noting that the case was not one "where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind," concluded that a statement Mosley made two hours after invoking his right to remain silent and after being again advised of his *Miranda* rights did not violate *Miranda*. *See id.*, 423 U.S. at 105–06, 96 S.Ct. at 327.

We applied that principle in *Latimer v. State*, 49 Md.App. 586, 433 A.2d 1234 (1981). There, Latimer had declined to sign a waiver of his *Miranda* rights at the Hagerstown City Police Department. *See id.* at 587, 433 A.2d 1234. Later that day, he was transported to the Maryland House of Correction, where he signed two waivers of his *Miranda* rights and made several statements that he later sought to suppress. *See id.* at 588, 433 A.2d 1234. The trial court denied his motion to suppress and this Court affirmed Latimer's conviction. We explained that,

in the situation where the defendant has chosen to remain silent without more, he has not necessarily indicated a belief that he is unable to speak for himself and is in need of an attorney. Instead, he has chosen to remain silent for the present; that choice should not, in our opinion, destroy all lines of communication nor make a prelude by the defendant absolutely necessary before further questioning.

*Latimer,* 49 Md.App. at 588, 433 A.2d 1234. The Court recognized that *"Miranda* does not create a per se proscription of all further interrogation once the person being interrogated has invoked his desire to remain silent." *See id.* at 590, 433 A.2d 1234.

We discussed *Mosley* and *Latimer* in *Freeman v. State,* 158 Md.App. 402, 857 A.2d 557 (2004). There, we concluded that the trial court had erred in failing to recognize Freeman's silence as an invocation of her right to remain silent. *Id.* at 433, 857 A.2d 557. We further concluded, however, that her invocation of her right to remain silent did not bar another officer from attempting to interrogate her three hours later. We explained:

Consistent with *Mosley,* a reasonable period of time elapsed between appellant's invocation of her right to silence [ ], and the interrogation conducted by Ruel. Although the locale and the topic were the same, the interrogator was different.

*Freeman,* 158 Md.App. at 440, 857 A.2d 557.

In *Manno v. State,* 96 Md.App. 22, 623 A.2d 677, *cert. denied,* 332 Md. 454, 632 A.2d 151 (1993), we held that Manno's telling the Towson State University officer who arrested him that he wished to remain silent did not bar a Baltimore County detective from asking appellant if he wanted to talk to him after the detective readvised him of his *Miranda* rights 40 minutes later. *See id.* at 40–41, 623 A.2d 677. We commented:

It is elemental to Fifth Amendment constitutional review that the overriding consideration is whether a statement is the product of the compulsive and coercive effect of deliberate efforts on the part of agents of the State to extract

incriminating information against the will of the target of the investigation. In no sense can the actions of Officer Grumbach be considered the opening volley of a succession of coercive efforts on the part of the police to extract a statement from appellant. There indeed was no attempt on his part to wear down the will of appellant or to obtain a statement that was the product of intimidation, coercion, deception, or overborne will.

*Manno,* 96 Md.App. at 42, 623 A.2d 677.

█ This, of course, is consistent with the rule that a *Miranda* violation does not preclude a later voluntary confession by a defendant. In *Miller v. State,* 380 Md. 1, 843 A.2d 803 (2004), the police, who had been looking for Miller, found him at home. *See id.* at 33, 843 A.2d 803. They removed him from his apartment into the hallway, but did not arrest or handcuff him. *See id.* They asked him about where he had been and what he had done that day, and elicited *incriminating* answers. *See id.* Miller later gave a statement at the police station after he had been advised of his *Miranda* rights. *See id.* at 34, 843 A.2d 803. Miller sought to suppress the statements made at his apartment and at the police station. *See id.* The trial court suppressed the former, but not the latter statements. *See id.* The Court of Appeals affirmed. Citing *Oregon v. Elstad,* 470 U.S. 298, 309, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222 (1985), the Court commented:

> The interrogation at the apartment, even if custodial in nature, was not coercive, his responses were largely exculpatory, and they had little, if any, influence on the inculpatory statements made later at the police station.

*Miller,* 380 Md. at 34, 843 A.2d 803.

Here, Cpl. Becker's interview of appellant occurred almost two hours after appellant told Cpl. Pearre that he was not going to tell him anything. The interview was at a different location and by a different officer, and was preceded by *Miranda* warnings. The comments appellant made to Cpl. Pearre were not so inculpatory that they affected the later interview. Appellant was not subjected to continued interro-

gation designed to "wear down his resistance and make him change his mind." *See Mosley,* 423 U.S. at 106, 96 S.Ct. at 327. Thus, even if appellant's statement was an invocation of the right to remain silent, that would not preclude Cpl. Becker from asking after a reasonable time whether appellant was then willing to waive his *Miranda* rights.

### Request For Counsel

The trial court did not specifically find that appellant did not ask for counsel, but commented that, "[g]iven Cpl. Becker's administration of *Miranda* prior to her questioning, the Court finds little significance in this fact." To the extent that the trial court believed that Cpl. Becker could interview appellant even if he had invoked his right to counsel as long as she advised him of his *Miranda* rights, the trial court was incorrect. As the United States Supreme Court made clear in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981),

> when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Edwards,* 451 U.S. at 484–485, 101 S.Ct. at 1884–85.

We conclude, however, that appellant did not validly invoke his right to counsel.

In *Marr,* we commented that, even if appellant's attorney could have invoked his right to counsel for him, we would conclude that "appellant did not validly invoke his Fifth Amendment right to counsel because the invocation by counsel occurred outside of the context of custodial interrogation."

*See id.* at 173, 759 A.2d 327. We noted that *"Miranda's* safeguards were intended to provide protection against the inherent coerciveness of custodial interrogation. The 'inherent compulsion' that is brought about by the combination of custody and interrogation is crucial for the attachment of Miranda rights." *Id.* We quoted *McNeil v. Wisconsin,* 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), in which the Court held that McNeil's request for counsel in a preliminary hearing did not act as an invocation of his Fifth Amendment right to counsel during custodial interrogation:

> *We have in fact never held that a person can invoke his Miranda rights anticipatorily, in a context other than "custodial interrogation"*—which a preliminary hearing will not always, or even usually, involve. If the Miranda right to counsel can be invoked at a preliminary hearing, it could be argued, there is no logical reason why it could not be invoked by a letter prior to arrest, or indeed even prior to identification as a suspect. Most rights must be asserted when the government seeks to take the action they protect against. *The fact that we have allowed the Miranda right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect.*

*Marr,* 134 Md.App. at 174–75, 759 A.2d 327 (quoting *McNeil,* 501 U.S. at 182 n. 3, 111 S.Ct. at 2211 n. 3) (citations omitted and emphasis added in *Marr*).

The facts in *Marr* are different from those in the present case, in that Marr's attempted invocation of his right to counsel occurred before he was in custody. *See Marr,* 134 Md.App. at 178, 759 A.2d 327. We specifically declined to decide whether, "in addition to custody, interrogation must be actual or at least imminent before the right to counsel can be invoked." *See id.* Nonetheless, the language of *McNeil* suggests that custody, absent interrogation, is insufficient. *See also Fenner v. State,* 381 Md. 1, 9, 846 A.2d 1020, *cert. denied,* 543 U.S. 885, 125 S.Ct. 158, 160 L.Ed.2d 143 (2004), in

which the Court of Appeals noted that, "in order for the *Miranda* safeguards to take effect, there must first exist 'custodial interrogation.'" Therefore, any request to the officer who placed appellant in a holding cell was ineffective.

In addition, the suppression court believed Cpl. Becker's testimony that appellant did not make a request for counsel until two hours into her interview with him. Accordingly, the trial court did not err in denying appellant's motion to suppress.

██ We would, in any event, consider any error to be harmless error. Although appellant acknowledged that he blamed Ms. Nicholls for his divorce and the loss of his home, his family and his car, Kristy Costley had already testified to that, and her testimony was corroborated by appellant's comments on the 9–1–1 tape. Appellant did not tell Cpl. Becker of "any kind of argument or altercation," but any prejudice that might cause was already present because he had not told the State Police Operator of any altercations, and because Brittany had said there was none. Although appellant admitted that he went to the Nicholls home and entered through the kitchen door, Brittany Costley had already testified to that and the police who responded to Brittany's and Ms. Reed's 9–1–1 calls found appellant in the home. Brittany testified to seeing appellant choke Ms. Nicholls, and both she and Tyler Costley testified to seeing appellant stab Ms. Nicholls. Appellant was seen in photographs purchasing a chef's knife at a Target store. Kristy found the shirt appellant was wearing in the photographs, bloody and balled up in Mr. Nicholls' closet. Given the limited nature of appellant's admissions, and the overwhelming evidence of his guilt, we are persuaded beyond a reasonable doubt that his statements to Cpl. Becker did not contribute to the jury's verdict. *See Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976); *Freeman,* 158 Md.App. at 434, 857 A.2d 557.

## II. *Voir Dire*

[14] Appellant's second contention is that the trial court abused its discretion in refusing to ask the jury, on *voir dire:*

"Has any member of the jury panel ever been divorced? Or has any member of the jury panel ever had 'in-law' problems such as where you had difficulty getting along with or had an in-law that caused marital interference or were denied visitation because of a spouse or in-law?"

Appellant contends that the question was necessary because the State attempted to establish that the motive for the killing was that appellant believed Mrs. Nicholls interfered in his marriage to Kristy Nicholls and blamed her for their divorce. He argues that "defense counsel sought to determine whether any juror would have been so affected by his or her own relationships with former spouses or in-laws that the juror would not be fair and impartial. The court abused its discretion by failing to ask a specific question to uncover such bias." The State counters that the question was nothing more than a " 'fishing expedition' designed to gather information for use in peremptory challenges."

### Scope Of *Voir Dire*

The scope of *voir dire* and the form of the questions propounded rests within the discretion of the trial judge. *See Curtin v. State*, 393 Md. 593, 603, 903 A.2d 922 (2006); *Hill v. State*, 339 Md. 275, 279, 661 A.2d 1164 (1995); *Davis v. State*, 333 Md. 27, 34, 633 A.2d 867 (1993). "The overriding principle or purpose" of *voir dire* is to ascertain "the existence of cause for disqualification." *See Hill*, 339 Md. at 279, 661 A.2d 1164 (citations omitted).

"[I]f a prospective juror is 'unable to apply the law' or 'holds a particular belief ... that would affect his ability or disposition to consider the evidence fairly and impartially,' he 'should be excused for cause.' " *Foster v. State*, 304 Md. 439, 454, 499 A.2d 1236 (1985) (citation omitted), *reconsideration denied*, 305 Md. 306, 503 A.2d 1326, *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986). In determining what questions are likely to uncover a cause for disqualification, "the questions should focus on issues particular to the defendant's case so that biases directly related to the crime, the witnesses, or the defendant may be uncovered."

*See State v. Thomas,* 369 Md. 202, 207, 798 A.2d 566 (2002). "Questions which are not directed towards a specific ground for disqualification, but instead are speculative, inquisitorial, catechising, or 'fishing,' asked in the aid of deciding on peremptory challenges, may be refused in the discretion of the court, even though it would not have been error to have asked them." *Davis,* 333 Md. at 34–35, 633 A.2d 867 (citation omitted).

"This Court has identified areas of mandatory inquiry when conducting voir dire: (1) racial, ethnic, and cultural bias; (2) religious bias; (3) predisposition as to the use of circumstantial evidence in capital cases; and (4) placement of undue weight on police officer credibility." *Uzzle v. State,* 152 Md.App. 548, 562, 832 A.2d 869, *cert denied,* 378 Md. 619, 837 A.2d 929 (2003). "Any other inquiries should not be peripheral, but should go directly to the potential bias that would be a basis for the prospective juror's disqualification." *Curtin v. State,* 165 Md.App. 60, 68, 884 A.2d 758, affirmed, 393 Md. 593, 903 A.2d 922 (2006). The court "need not make any particular inquiry of prospective jurors unless that inquiry is directed toward revealing cause for disqualification." *Curtin,* 165 Md.App. at 68, 884 A.2d 758.

Here, appellant was charged with first degree murder and a related weapons offense. Although appellant's relationship with his in-laws was the alleged motive for the killing, there is nothing about the relationship that would affect the criminal nature of appellant's acts. There were no facts at issue that would allow the jurors to determine that the appellant's actions were mitigated by his relationship with his mother-in-law. There were no real issues of credibility, because, although appellant's father in-law testified, his testimony related to peripheral issues only. The proposed question was not reasonably calculated toward revealing cause for disqualification, and the trial court did not err in declining to ask it.

### III. Autopsy Report And Testimony

At trial, the State introduced the autopsy report pertaining to Helga Nicholls. Because neither of the Assistant Medical

Examiners who prepared the report was employed by the Medical Examiner's Office at the time of trial, Dr. David Fowler, the Chief Medical Examiner, testified. As Chief Medical Examiner, Dr. Fowler had reviewed the report and signed the opinion page.

The trial took place in October 2003, before the United States Supreme Court's decision in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which was decided on March 4, 2004. In *Crawford,* the Court held that, "[w]here testimonial evidence is at issue ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *See Crawford,* 541 U.S. at 68, 124 S.Ct. at 1374. Appellant contends that the autopsy report is testimonial and that the trial court should not have been admitted it into evidence. He also contends that, pursuant to *Rollins v. State,* 392 Md. 455, 897 A.2d 821, *cert. denied,* —— U.S. ——, 127 S.Ct. 392, 166 L.Ed.2d 280 (2006), the trial court erred in failing to redact the portions of the autopsy report containing the opinions and conclusions of the doctors.

Appellant acknowledges that he made no objection to the admission of the autopsy report, but argues that "where the law changes while a case is on direct appeal, the appellant may raise an issue generated by the new state of the law for the first time in the appellate court."

The State responds that the issue is unpreserved. It asserts that, in the alternative, *Rollins* is dispositive and that, in any event, the autopsy reports are business records and public records and are not testimonial.

### Preservation

Appellant concedes that he did not object to the admission of the autopsy report on confrontation grounds, and attempts to excuse his failure to do so by explaining that *Crawford* had not yet been decided at the time of his trial. The State disagrees that *Crawford* not having been decided

excuses appellant from objecting to the admission of the autopsy.

Even before *Crawford*, this Court and the Court of Appeals had noted that, even when a document is a business record, not all parts of it are necessarily admissible. In *Benjamin v. Woodring*, 268 Md. 593, 303 A.2d 779 (1973), the Court of Appeals construed the statute setting out the duty of the medical examiner as indicating that the portion of a death certificate stating the medical examiner's opinion as to manner of death was inadmissible in evidence. *See id.* at 608, 303 A.2d 779. This Court applied that decision in a criminal context in *Grover v. State*, 41 Md.App. 705, 398 A.2d 528 (1979), and concluded that an autopsy report, including the factual findings of a neuropathologist employed by the medical examiner to testify, had been properly admitted into evidence. In rejecting Grover's Confrontation Clause argument, the Court explained:

> In *Gregory v. State, supra* [40 Md.App. 297, 391 A.2d 437 (1978)], we noted that the field of forensic psychiatry was an inexact science and that differences of opinion frequently existed between experts in the field. This being so, we concluded that the opportunity to cross-examine a witness giving such opinion evidence could be of crucial importance. It should not be supposed that *Gregory* stands for the proposition that the confrontation clause of the constitution precludes the admission of all evidence under exceptions to the hearsay rule. Dr. Azzarelli's statement in the autopsy report did not express any opinion. It merely stated his findings of the physical condition of the decedent's brain. As such it falls under the category of a "fact or condition objectively ascertained," and was probably admissible as a business record as provided by the *Md.Code*, Courts and Judicial Proceedings Article, Section 10–101. It was clearly admissible under Md.Code, Article 22, s 8 which has been construed by *Benjamin v. Woodring*, 268 Md. 593, 608, 303 A.2d 779 (1973) to make autopsy reports admissible as to facts, but not as to opinions.

*Grover,* 41 Md.App. at 710–11, 398 A.2d 528 (internal footnote omitted).

In *Bowers v. State,* 298 Md. 115, 468 A.2d 101 (1983), the Court of Appeals rejected Bowers' assertion that the admission of an autopsy report without the testimony of the medical examiner who prepared it violated his constitutional right to confront witnesses against him. The Court noted the decision in *Grover,* stating:

> As in *Grover,* the autopsy report here merely stated findings as to the physical condition of the victim. The only thing that comes near to an opinion in the report are its final two sentences which state, "In view of the history and findings at autopsy, the death of MONICA MCNAMARA, a twenty-eight year old White female, is attributed to strangulation. The manner of death is HOMICIDE." Although it was only the opinion of the medical examiner that this was a homicide, there has never been any dispute but what it was. Moreover, Bowers admitted that she was strangled.

*Bowers,* 298 Md. at 136–37, 468 A.2d 101.

Thus, even before *Crawford,* there was support for the position that opinions in autopsy reports, as opposed to factual findings, were not admissible without the testimony of the author. Appellant could have made the same argument at trial that he makes now. Appellant's objection is, therefore, unpreserved.

We also note that, even if the objection was preserved, we would find no reversible error.

## The Autopsy Report In This Case

In the autopsy report on Helga Nicholls, the "pathological diagnoses" were listed as "multiple blunt and sharp force injuries." The following was listed under "Opinion":

> This 53 year old white female, **Helga Nicholls,** died of **multiple blunt and sharp force injuries.** The blunt force injuries consisted of at least two impacts to the head that caused injury to the brain with one area of bleeding. The impacts may have stunned or incapacitated Ms. Nicholls.

There were multiple (13) stab wounds to the chest (5), abdomen (6), face (1), and right arm (1). Stab wound A to the right front of the chest injured the right lung and caused marked internal bleeding. Stab wound E to the left side of the chest injured the diaphragm (a muscle to assist one in breathing). Stab wounds F, G, H, I and J to the front of the abdomen injured intestine and soft tissue in the belly. Stab wound K to the right side of the body injured the liver and fractured a rib. The remaining stab wounds did not injure vital structures and contributed to death through bleeding. There were multiple cuts on the hands and a stab wound to the right arm consistent with a defensive posture. The manner of death is **homicide.**

The report was signed by Drs. Pestaner, Gwynn and Fowler.

At trial, Dr. Fowler testified as an expert in the field of forensic pathology. He reported that he had reviewed the autopsy as Chief Medical Examiner and had "signed off" on the case. He testified that the autopsy was performed "according to a very standard protocol" at the office.

Fowler described the objective findings, stating that the examination showed "a well-nourished white female who had multiple stab wounds at first examination and as the examination went on, additional blunt force injuries were also identified to the head area." He explained that one "was an area of three by two inches surrounding the left eye and onto the left cheek and this was associated with swelling and discoloration of the eyelid area and some evidence of a hematoma." He explained that there "was also a hematoma of the upper base and back area of the neck which stretched down onto the back to the area close to the actual shoulder blades," and that "[a]ssociated with these injuries was a small area of bleeding on the surface of the brain in the arachnoids meninges, which is one of the membranes which aligns the surface of the brain." He then noted that "there was a series of thirteen stab wounds which were identified on the body," and described in the autopsy report. The injuries described in the report

were detailed observations made during the examination without explanation relating them to Nicholls' death. Dr. Fowler used the description of the injuries to explain their effects. For example with "Stab Wound A," Fowler explained the significance of the 540 milliliters of blood in the right pleural cavity:

> This is a significant amount of bleeding. First of all, that amount of bleeding is going to cause the person to go into what we know as hemorrhagic shock, which is a rapidly life-threatening process. But, also to allow us air to come in through the cut and also through the cut surface of the lung and get in-between the lung and the lining of the chest, which causes the lung to collapse. Once the lung collapses, it is functionally of no use in being able to exchange oxygen and carbon dioxide with the air around us. So, she's not only lost a significant proportion of her circulating blood volume, at least into the chest, but she's also potentially suffered a collapsed lung because of that.

With respect to the stab wound to the right forearm, Fowler explained:

> There is another stab wound that does need to be brought to your attention and that is the stab wound to the right forearm, . . . This is one, which, in the opinion at the end of the autopsy, is connected with the statement with is consistent—the injuries to the right arm is consistent with a defensive posture.

Asked to explain "defensive posturing," Fowler said:

> Defense posturing or defense injuries . . . are quite simply injuries which you find on the part of the body of a person where you would expect the person normally to have interposed that part of their body between themselves and some sort of noxious attack, so if someone attempted to attack me, I would use my hands and my arms in order to defend myself and so, in cases of sharp force injury, it's not at all unusual to find injuries in those areas which we cannot certainly absolutely say are defense posturing, because we were not present and witnessed, but they are entirely in the

right position and shape and size and are consistent with that type of activity.

He explained "the conclusion process and how that was formulated in regard to the cause of death and the manner of death":

The cause of death was certified as multiple blunt and sharp force injuries and although we say blunt force first, it doesn't, again, imply that the blunt force was more important than the sharp force. It is merely the convention of the Office of the Chief Medical Examiner to list all injuries as potentially being life-threatening even some of the stab wounds that did not pass into vital organs still caused bleeding which would accelerate and contribute to the death certainly in a lesser format than say the one to the right lung, but they certainly still contributed and so they are listed. So, the cause of death was listed as multiple blunt and sharp force injuries.

The doctor further stated: "The manner of death was, in our opinion, homicide." He explained their opinion that the impacts may have stunned or incapacitated Nicholls:

When one finds hemorrhaging on the surface of the brain, that indicates more than enough force to damage, if not temporarily incapacitate, the neurons. There's a—well document, again, in the medical literature, that blood vessels are far stronger than the actual neurons and nerve tissues, so by the time you see bleeding, which means that the blood vessels, themselves, have been ruptured and broken because of the force that was applied to that area, it goes without saying that there's also been damage to the nerve tissues and since the nerve tissue inside our cranial cavity is the one which governs our consciousness, it's not an unreasonable expectation that she may have been at least disoriented, if not rendered unconscious, at least temporarily, by one of these blows, but, again, everybody is an individual.

Fowler also viewed the knife alleged to be the murder weapon and opined that "that weapon is entirely consistent with the description of the wounds noted in the autopsy report

by Doctor Pestaner and Doctor Gwynn," and explained the basis of that conclusion.

Defense counsel cross-examined Dr. Fowler with respect to the report and his testimony.

### Rollins v. State, et. al.

The victim in *Rollins*, Ms. Ebberts, was a seventy-one year old woman with a heart condition. *Rollins*, 392 Md. at 461, 897 A.2d 821. She was found unresponsive, lying in her bed with her oxygen machine operating. *Id.* William Garland, the relative who found the victim, called the paramedics and told them she had suffered "cardiac arrest." The paramedics recognized "no signs of trauma," and turned off the oxygen machine. *Id.*

There were signs that Ebberts' home had been the subject of a burglary: there was an open window with "dirt and debris" on the window sill and a garbage can just outside the window. *Id.* The pillows were in the middle of the bed, without covers, and there was "some evidence of ransacking or searching the bedroom." *Id.* at 461–62, 897 A.2d 821. The officers discovered that cash and jewelry boxes were missing. *Id.* at 462, 897 A.2d 821. Rollins, Ebberts' neighbor, became a suspect when his girlfriend told the police, *inter alia,* that Rollins "told her he could kill the victim by 'putting a pillow over her head.'" *Id.* at 462, 897 A.2d 821. After his arrest, Rollins admitted breaking into the Ebberts house to "borrow" money, but denied harming her. *Id.*

Dr. Pestaner performed the autopsy on Ebberts. He concluded:

> This 71 year old white female, Irene Ebberts, died of smothering, a lack of oxygen from covering the nose and mouth. Ms. Ebberts was found dead in bed at her house. Investigation revealed personal property missing and previous threats of harm had been made to smother Ms. Ebberts. Autopsy revealed a sick woman who had significant heart and lung disease and an acute pneumonia was present in the lung. Evidence of smothering included hemorrhage

in the mucosa on one side of the mouth. The manner of death is homicide. The decedent was not consuming alcoholic beverages prior to death and a comprehensive drug test was negative. There was no evidence of sexual activity.

*Rollins,* 392 Md. at 463–64, 897 A.2d 821.

At the time of trial, Dr. Pesterer was no longer employed by the Office of the Chief Medical Examiner. *Id.* at 465 n. 4, 897 A.2d 821. Before trial, Rollins moved to exclude, *inter alia,* the testimony of the Deputy Medical Examiner, Dr. Mary G. Ripple, which Rollins claimed was derived from "hearsay information unrelated to medical findings." *Id.* at 459, 897 A.2d 821. The primary defense at trial was to be that the victim died of natural causes, not homicide. *Id.* at 467, 897 A.2d 821. The court ordered that all references in the autopsy report as to the cause and manner of death be redacted, including all references to smothering, homicide and disease, and to the "ultimate conclusion" that "the manner of death was homicide by asphyxiation." *Id.* at 465, 897 A.2d 821. The court nonetheless agreed that Dr. Ripple could testify as to her conclusions and opinions based on the information in the autopsy report.

At trial, the State presented expert testimony from Dr. Ripple that Ebberts' death was a homicide, while the defense countered with three expert witnesses who testified that Ms. Ebberts died of natural causes. *Id.* at 466–67, 897 A.2d 821. Rollins was found guilty of first degree felony murder, second degree murder, robbery and burglary. *Id.* at 467, 897 A.2d 821. On appeal, Rollins claimed that the admission of the autopsy report into evidence, without the testimony of the doctor who prepared it, violated his rights under the Confrontation Clause. *Id.*

The *Rollins* Court concluded that the autopsy report was, by statute, competent evidence, not excluded by the hearsay rule. *Id.* at 479–80, 897 A.2d 821. It concluded that the report was a business record and a public record, *id.* at 482–83, 897 A.2d 821, but noted:

The mere fact that a document is part of a hospital record made in the ordinary course of the hospital's business, and may therefore be admissible under the hearsay rule, does not ipso facto make its admission comply with the confrontation requirement. . . .

*Id.* at 491, 897 A.2d 821 (citation omitted). The Court of Appeals noted that various parts of the report were different in nature:

Although an autopsy report may be classified as both a business and a public record, it is the contents of the autopsy report that must be scrutinized in order to determine the propriety of its admission into evidence without the testimony of its preparer. If the autopsy report contains only findings about the physical condition of the decedent that may be fairly characterized as routine, descriptive and not analytical, and those findings are generally reliable and are afforded an indicium of reliability, the report may be admitted into evidence without the testimony of its preparer, and without violating the Confrontation Clause. If the autopsy report contains statements which can be categorized as contested opinions or conclusions, or are central to the determination of the defendant's guilt, they are testimonial and trigger the protections of the Confrontation Clause, requiring both the unavailability of the witness and prior opportunity for cross-examination.

*Id.* at 497, 897 A.2d 821.

The Court rejected Rollins' assertion that an autopsy report could not be submitted without the testimony of its author, explaining:

We reject petitioner's theory that the admission of an autopsy report, without the testimony of its preparer, is a per se violation of the Confrontation Clause. *Bowers* makes it clear that an autopsy report may be admitted without the testimony of the physician who prepared it. An autopsy report, however, should be supplemented at trial with expert testimony in regard to the "manner" of death. See Joseph F. Murphy, Jr., Maryland Evidence Handbook

§ 804(D)(1) at 328 (3d ed. 1999) (citing *Benjamin v. Woodr-ing*, 268 Md. 593. 608–09, 303 A.2d 779, 788 (1973)). Our decisions in *Benjamin v. Woodring* and in *Sippio, supra*, support the proposition that, while the determination of manner of death is clearly within the purview of the medical examiner, the manner of death portion of an autopsy report should be supplemented with expert testimony at trial. In the instant case, consistent with the requirements of Maryland law, Dr. Ripple's testimony supplemented the autopsy report both as to manner and cause of death.

*Rollins*, 392 Md. at 509–10, 897 A.2d 821.

In *Sippio v. State*, 350 Md. 633, 714 A.2d 864 (1998), Dr. John Smialek, then the Chief Medical Examiner for the State of Maryland, performed an autopsy on Sippio's victim, Brenda Branch. Based on his examination of Branch, Dr. Smialek concluded that the cause of death was a close-range gunshot wound to the head, and that the manner of death was homicide, rather than accident or suicide. *Id.* at 640, 714 A.2d 864. Sippio testified, however, that he had been "playing with the gun" when it fired. *Id.* at 641–42, 714 A.2d 864. Sippio objected to Smialek's opinion testimony that the manner of death was "homicide." *Id.* at 643, 714 A.2d 864.

The Court concluded that Dr. Smialek was qualified to testify as an expert in the area in which he was testifying and that the matter about which he testified was appropriate for expert testimony. *Id.* at 649–50, 714 A.2d 864. Dr. Smialek explained to the jury why he rejected accident and suicide as the possible manners of death. *Id.* at 650–51, 714 A.2d 864. He also explained to the jury that "homicide" in that context meant that "someone else fired a weapon to kill Ms. Branch," *id.* at 651, 714 A.2d 864 (emphasis omitted), and did not rule out self-defense or justifiable homicide. *Id.* at 652, 714 A.2d 864.

Although there was no Confrontation Clause problem in *Sippio*, the *Rollins* Court noted that that was not the controlling issue there:

The fact that Dr. Smialek had performed the autopsy on the victim in *Sippio* was not the sole reason for our decision that the subject matter that Dr. Smialek testified about was appropriate. We noted Dr. Smialek's testimony concerning his knowledge of Sippio's statement to police that he had shot the victim, taken together with the investigation, allowed him to reach the conclusion that the victim's death was a homicide.

*Rollins,* 392 Md. at 507 n. 29, 897 A.2d 821.

## Application To This Case

In *Rollins,* as noted, the Court of Appeals stated that if the autopsy report contained statements "which can be categorized as contested opinions or conclusions, or are central to the determination of the defendant's guilt, they are testimonial and trigger the protections of the Confrontation Clause." *Rollins,* 392 Md. at 497, 897 A.2d 821. Here, in contrast, appellant notes that neither that conclusion nor the conclusion that the manner of death was homicide was challenged at trial. Although appellant adds that "defense counsel did cross-examine Dr. Fowler with an eye toward establishing some evidence bearing on self-defense," the categorization of the killing as a "homicide" does not indicate that it was not self-defense. *Sippio,* 350 Md. at 652, 714 A.2d 864. Therefore, although the autopsy report was properly redacted in *Rollins,* it does not follow that redaction was necessary in this case.

In the present case, Dr. Fowler had reviewed the opinions set forth in the report and had approved them. He explained why the "cause of death" was listed as "multiple blunt and sharp force injuries" and the manner of death was listed as homicide, using the findings in the report as his bases. He explained the opinion that Mrs. Nicholls may have been "stunned" or "incapacitated," and opined that the weapon found in Mrs. Nicholls' bedroom was consistent with the stab wounds found on her body, again based on the findings in the report. Defense counsel cross-examined him on the findings and opinions. While asking about alleged bruises visible on photographs of appellant, defense counsel acknowledged that

the opinions given during Fowler's testimony were those of Fowler:

> ... Your Honor, he didn't examine Helga Nicholls either and he gave an opinion and now he opened the door as to defense wounds and I have a right now to explore that. He's given an opinion based on reading a report, looking at photographs, that he can now give an opinion that's is [sic] possible so that injuries on Ms. Nicholls were consistent with being defensive wounds.

In short, Dr. Fowler testified to his opinions based on the physical findings in the autopsy report, and defense counsel was able to cross-examine him on how his conclusions were reached. Appellant did not dispute the opinions set forth in the report. There was no error in admitting the report or Dr. Fowler's testimony.

## IV. Instruction On Depraved Heart Murder

▮ Appellant requested that the trial court instruct the jury on second degree depraved heart murder and involuntary manslaughter as set forth in MPJI–Cr. 4:17.8.[2] The State

---

2. MPJI–Cr. 4:17.8 provides:

HOMICIDE—SECOND DEGREE DEPRAVED HEART MURDER AND INVOLUNTARY MANSLAUGHTER (GROSSLY NEGLIGENT ACT AND UNLAWFUL ACT)

> The defendant is charged with the crime of murder. This charge includes second degree murder and involuntary manslaughter.

---

A

SECOND DEGREE DEPRAVED HEART MURDER

> Second degree murder is the killing of another person while acting with an extreme disregard for human life. In order to convict the defendant of second degree murder, the State must prove:
> (1) that the conduct of the defendant caused the death of (victim);
> (2) that the defendant's conduct created a very high degree of risk to the life of (victim); and
> (3) that the defendant, conscious of such risk, acted with extreme disregard of the life-endangering consequences.

---

B

INVOLUNTARY MANSLAUGHTER—GROSSLY NEGLIGENT ACT

asserted that the evidence had not generated those crimes, and the trial court agreed. In this appeal, appellant asserts, "[b]ecause the evidence supported a finding of general intent to engage in life-threatening conduct, without a specific intent to kill," the trial court erred in not giving the instruction. The State disagrees. So do we.

### Need For An Instruction

■ Md. Rule 4–325(c) provides that "[t]he court may, and at the request of any party shall, instruct the jury as to the applicable law." When requested to do so by a party, the trial court is required to give an instruction that correctly states the applicable law if it has not been fairly covered in the instructions actually given. *See State v. Martin,* 329 Md. 351, 356, 619 A.2d 992 (1993), *cert. denied,* 510 U.S. 855, 114 S.Ct. 161, 126 L.Ed.2d 122 (1993); *Mack v. State,* 300 Md. 583, 592, 479 A.2d 1344 (1984).

■ The instruction need not be given, however, unless the defendant has generated the issue, *i.e.,* has produced "some evidence" sufficient to give rise to a jury issue on the defense. *See Dykes v. State,* 319 Md. 206, 216, 571 A.2d 1251

---

The defendant is charged with the crime of involuntary manslaughter. In order to convict the defendant of involuntary manslaughter, the State must prove:
(1) that the conduct of the defendant caused the death of (victim); and
(2) that the defendant, conscious of the risk, acted in a grossly negligent manner, that is, in a manner that created a high degree of risk to human life.

---

C
INVOLUNTARY MANSLAUGHTER—UNLAWFUL ACT
The defendant is charged with the crime of involuntary manslaughter. In order to convict the defendant of involuntary manslaughter, the State must prove:
(1) that the defendant [or another participating in the crime with the defendant] [committed] [attempted to commit] a (unlawful act(s));
(2) that the defendant [or another participating in the crime] killed (victim); and
(3) that the act resulting in the death of (victim) occurred during the [commission] [attempted commission] [escape from the immediate scene] of the (unlawful act(s)).

(1990). Nonetheless, when a court is requested to instruct on a lesser included offense,

> the test is not whether there is sufficient evidence to convict of the lesser included offense but whether the evidence is such "that the jury could rationally convict only on the lesser included offense."

*Burch v. State,* 346 Md. 253, 279, 696 A.2d 443 (citation omitted), *cert. denied,* 522 U.S. 1001, 118 S.Ct. 571, 139 L.Ed.2d 410 (1997).

We agree with the State that *Burch* is dispositive here. In *Burch,* the Court of Appeals explained that depraved heart murder is "a killing resulting from 'the deliberate perpetration of a knowingly dangerous act with reckless and wanton unconcern and indifference as to whether anyone is harmed or not.' " *Burch,* 346 Md. at 274, 696 A.2d 443 (quoting *Robinson v. State,* 307 Md. 738, 744, 517 A.2d 94 (1986), which, in turn, quoted from *De Bettencourt v. State,* 48 Md.App. 522, 530, 428 A.2d 479, *cert. denied,* 290 Md. 713 (1981)).

The Court in *Burch* explained why an instruction on that issue was not required under the facts of that case. It noted the facts involved in the murder of Mrs. Davis:

> As we have indicated, appellant pummelled a 78–year old, 97–pound frail woman, apparently with a telephone receiver, with such force as to break 13 ribs and two other bones and cause extensive bleeding. Neither the fact that he could have done even more damage and thus ended her life even quicker nor the fact that the victim was still alive when he left the house detracts, in the least, from the compelling inference that the beating he did administer must have been with the intent either to kill or to do such serious bodily harm that death would be the likely result. Under appellant's theory, virtually any murder committed by beating or that does not involve instantaneous death could qualify as depraved heart murder. That is not the law.
>
> This is not a case like *Hook* [*v. State,* 315 Md. 25, 553 A.2d 233 (1989)] or *Fairbanks* [*v. State,* 318 Md. 22, 566 A.2d 764 (1989)]. The jury was not left with an all-or-nothing option.

It was instructed on the two varieties of second degree murder upon which a plausible verdict could have been returned. It is simply beyond the realm of reasonableness to suppose that any rational jury could find that appellant administered the beating to Mrs. Davis with mere recklessness or indifference as to the result.

*Burch,* 346 Md. at 280, 696 A.2d 443.

It reached the same conclusion with respect to the killing of Mr. Davis:

What appellant conveniently overlooks, of course, is that he stabbed Mr. Davis at least 11 times, once severing the aorta, once plunging more than three inches into his heart, and once penetrating the lung. That is hardly conduct engaged in "without regard to whether Mr. Davis lived or died." For the reasons set forth in the discussion concerning Mrs. Davis, it is clear that there was no basis for a depraved heart murder instruction as to Mr. Davis.

*Burch,* 346 Md. at 281, 696 A.2d 443.

In the present case, the evidence established that appellant went to a Target store and bought a chef's knife, then immediately went to the Nicholls' home. He immediately began to choke Ms. Nicholls. Then, when she fell, appellant stabbed her as she lay on the ground. The autopsy report established that there were thirteen stab wounds, one of which penetrated seven and a half inches into the body, through the third and fourth ribs, through skin and chest muscles, causing a "significant amount of bleeding." There was a wound that penetrated five and a half inches into the body and fractured a rib, and another that penetrated into the liver, also causing a great deal of bleeding. There were "a group of stab wounds" in Mrs. Nicholls' abdomen, and other stab wounds to the chest. All of the wounds were sufficient "to cause hemorrhaging externally" as well. In addition, Mrs. Nicholls suffered blunt force injuries to the head with enough force to cause hemorrhaging on the surface of the brain. There were also seven cutting wounds.

As in *Burch*, the jury was instructed on second degree murder based on appellant's engaging in conduct either with the intent to kill Ms. Nicholls or the intent to inflict such serious bodily harm that death would be the likely result. Given the nature and number of the injuries inflicted on Ms. Nicholls, the jury in this case was faced with a "compelling inference" that appellant's actions "must have been with the intent either to kill or to do such serious bodily harm that death would be the likely result." *See Burch*, 346 Md. at 280, 696 A.2d 443. The trial court did not err in declining to instruct the jury as appellant requested.

**JUDGMENTS AFFIRMED;**

**COSTS TO BE PAID BY APPELLANT.**